# RUBIN, SECRETARY OF THE TREASURY *v.* COORS BREWING CO.

No. 93–1631.   Argued November 30, 1994—Decided April 19, 1995

Thomas, J., delivered the opinion of the Court, in which Rehnquist, C. J., and O'Connor, Scalia, Kennedy, Souter, Ginsburg, and Breyer, JJ., joined. Stevens, J., filed an opinion concurring in the judgment, *post*, p. 491.

*Deputy Solicitor General Kneedler* argued the cause for petitioner. With him on the briefs were *Solicitor General Days, Assistant Attorney General Hunger, Richard H. Seamon, Michael Jay Singer,* and *John S. Koppel.*

*Bruce J. Ennis, Jr.,* argued the cause for respondent. With him on the brief were *Donald B. Verrilli, Jr., Paul M. Smith, Nory Miller, M. Caroline Turner,* and *Terrance D. Micek.*\*

JUSTICE THOMAS delivered the opinion of the Court.

Section 5(e)(2) of the Federal Alcohol Administration Act prohibits beer labels from displaying alcohol content. We granted certiorari in this case to review the Tenth Circuit's holding that the labeling ban violates the First Amendment because it fails to advance a governmental interest in a direct and material way. Because § 5(e)(2) is inconsistent with the protections granted to commercial speech by the First Amendment, we affirm.

I

Respondent brews beer. In 1987, respondent applied to the Bureau of Alcohol, Tobacco and Firearms (BATF), an agency of the Department of the Treasury, for approval of proposed labels and advertisements that disclosed the alcohol content of its beer. BATF rejected the application on the ground that the Federal Alcohol Administration Act (FAAA or Act), 49 Stat. 977, 27 U. S. C. § 201 *et seq.*, prohibited disclosure of the alcohol content of beer on labels or in advertising. Respondent then filed suit in the District

---

\*Briefs of *amici curiae* urging reversal were filed for the Center for Science in the Public Interest by *Bruce A. Silverglade;* and for the Council of State Governments et al. by *Richard Ruda.*

Briefs of *amici curiae* urging affirmance were filed for the Association of National Advertisers, Inc., et al. by *Burt Neuborne, Gilbert H. Weil, Valerie Schulte,* and *John F. Kamp;* for Public Citizen by *David C. Vladeck;* for the United States Telephone Association et al. by *Michael W. McConnell, Kenneth S. Geller, Charles A. Rothfeld, William Barfield,* and *Gerald E. Murray;* and for the Washington Legal Foundation by *Charles Fried, Donald B. Ayer, Daniel J. Popeo,* and *Richard A. Samp.*

Briefs of *amici curiae* were filed for the Beer Institute by *P. Cameron DeVore, John J. Walsh,* and *Steven G. Brody;* and for the Wine Institute by *John C. Jeffries, Jr.*

Court for the District of Colorado seeking a declaratory judgment that the relevant provisions of the Act violated the First Amendment; respondent also sought injunctive relief barring enforcement of these provisions. The Government took the position that the ban was necessary to suppress the threat of "strength wars" among brewers, who, without the regulation, would seek to compete in the marketplace based on the potency of their beer.

The District Court granted the relief sought, but a panel of the Court of Appeals for the Tenth Circuit reversed and remanded. *Adolph Coors Co.* v. *Brady*, 944 F. 2d 1543 (1991). Applying the framework set out in *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980), the Court of Appeals found that the Government's interest in suppressing alcoholic "strength wars" was "substantial." *Brady, supra,* at 1547–1549. It further held, however, that the record provided insufficient evidence to determine whether the FAAA's ban on disclosure "directly advanced" that interest. *Id.,* at 1549–1551. The court remanded for further proceedings to ascertain whether a " 'reasonable fit' " existed between the ban and the goal of avoiding strength wars. *Id.,* at 1554.

After further factfinding, the District Court upheld the ban on the disclosure of alcohol content in advertising but invalidated the ban as it applied to labels. Although the Government asked the Tenth Circuit to review the invalidation of the labeling ban, respondent did not appeal the court's decision sustaining the advertising ban. On the case's second appeal, the Court of Appeals affirmed the District Court. *Adolph Coors Co.* v. *Bentsen*, 2 F. 3d 355 (1993). Following our recent decision in *Edenfield* v. *Fane*, 507 U. S. 761 (1993), the Tenth Circuit asked whether the Government had shown that the " 'challenged regulation advances [the Government's] interests in a direct and material way.' " 2 F. 3d, at 357 (quoting *Edenfield, supra,* at 767–768). After reviewing the record, the Court of Appeals concluded that the Government

had failed to demonstrate that the prohibition in any way prevented strength wars. The court found that there was no evidence of any relationship between the publication of factual information regarding alcohol content and competition on the basis of such content. 2 F. 3d, at 358–359.

We granted certiorari, 512 U. S. 1203 (1994), to review the Tenth Circuit's decision that § 205(e)(2) violates the First Amendment. We conclude that the ban infringes respondent's freedom of speech, and we therefore affirm.

## II

### A

Soon after the ratification of the Twenty-first Amendment, which repealed the Eighteenth Amendment and ended the Nation's experiment with Prohibition, Congress enacted the FAAA. The statute establishes national rules governing the distribution, production, and importation of alcohol and established a Federal Alcohol Administration to implement these rules. Section 5(e)(2) of the Act prohibits any producer, importer, wholesaler, or bottler of alcoholic beverages from selling, shipping, or delivering in interstate or foreign commerce any malt beverages, distilled spirits, or wines in bottles

> "unless such products are bottled, packaged, and labeled in conformity with such regulations, to be prescribed by the Secretary of the Treasury, with respect to packaging, marking, branding, and labeling and size and fill of container . . . as will provide the consumer with adequate information as to the identity and quality of the products, the alcoholic content thereof (*except that statements of, or statements likely to be considered as statements of, alcoholic content of malt beverages are prohibited unless required by State law* and except that, in case of wines, statements of alcoholic content shall be required only for wines containing more than 14 per centum of alcohol by volume), the net contents of

the package, and the manufacturer or bottler or importer of the product." 27 U. S. C. § 205(e)(2) (emphasis added).

The Act defines "'malt beverage[s]'" in such a way as to include all beers and ales. § 211(a)(7).

Implementing regulations promulgated by BATF (under delegation of authority from the Secretary of the Treasury) prohibit the disclosure of alcohol content on beer labels. 27 CFR § 7.26(a) (1994).[1] In addition to prohibiting numerical indications of alcohol content, the labeling regulations proscribe descriptive terms that suggest high content, such as "strong," "full strength," "extra strength," "high test," "high proof," "pre-war strength,"· and "full oldtime alcoholic strength." § 7.29(f). The prohibitions do not preclude labels from identifying a beer as "low alcohol," "reduced alcohol," "non-alcoholic," or "alcohol-free." *Ibid.;* see also §§ 7.26(b)–(d). By statute and by regulation, the labeling ban must give way if state law requires disclosure of alcohol content.

## B

Both parties agree that the information on beer labels constitutes commercial speech. Though we once took the position that the First Amendment does not protect commercial speech, see *Valentine* v. *Chrestensen,* 316 U. S. 52 (1942), we repudiated that position in *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748 (1976). There we noted that the free flow of commercial information is "indispensable to the proper allocation of resources in a free enterprise system" because it informs the numerous private decisions that drive the system. *Id.,* at 765. Indeed, we observed that a "particular consumer's interest in the

---

[1] BATF has suspended § 7.26 to comply with the District Court's order enjoining the enforcement of that provision. 58 Fed. Reg. 21228 (1993). Pending the final disposition of this case, interim regulations permit the disclosure of alcohol content on beer labels. 27 CFR § 7.71 (1994).

free flow of commercial information . . . may be as keen, if not keener by far, than his interest in the day's most urgent political debate." *Id.*, at 763.

Still, *Virginia Board of Pharmacy* suggested that certain types of restrictions might be tolerated in the commercial speech area because of the nature of such speech. See *id.*, at 771–772, n. 24. In later decisions we gradually articulated a test based on "'the "commonsense" distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech.'" *Central Hudson,* 447 U. S., at 562 (quoting *Ohralik* v. *Ohio State Bar Assn.,* 436 U. S. 447, 455–456 (1978)). *Central Hudson* identified several factors that courts should consider in determining whether a regulation of commercial speech survives First Amendment scrutiny:

> "For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." 447 U. S., at 566.

We now apply *Central Hudson*'s test to § 205(e)(2).[2]

---

[2] The Government argues that *Central Hudson* imposes too strict a standard for reviewing § 205(e)(2), and urges us to adopt instead a far more deferential approach to restrictions on commercial speech concerning alcohol. Relying on *United States* v. *Edge Broadcasting Co.,* 509 U. S. 418 (1993), and *Posadas de Puerto Rico Associates* v. *Tourism Co. of P. R.,* 478 U. S. 328 (1986), the Government suggests that legislatures have broader latitude to regulate speech that promotes socially harmful activities, such as alcohol consumption, than they have to regulate other types of speech. Although *Edge Broadcasting* and *Posadas* involved the advertising of gambling activities, the Government argues that we also have applied this principle to speech concerning alcohol. See *California* v. *LaRue,* 409

## III

Both the lower courts and the parties agree that respondent seeks to disclose only truthful, verifiable, and nonmisleading factual information about alcohol content on its beer labels. Thus, our analysis focuses on the substantiality of the interest behind § 205(e)(2) and on whether the labeling ban bears an acceptable fit with the Government's goal. A careful consideration of these factors indicates that § 205(e)(2) violates the First Amendment's protection of commercial speech.

### A

The Government identifies two interests it considers sufficiently "substantial" to justify § 205(e)(2)'s labeling ban. First, the Government contends that § 205(e)(2) advances Congress' goal of curbing "strength wars" by beer brewers who might seek to compete for customers on the basis of alcohol content. According to the Government, the FAAA's restriction prevents a particular type of beer drinker—one

---

U. S. 109, 138 (1972) (holding that States may ban nude dancing in bars and nightclubs that serve liquor).

Neither *Edge Broadcasting* nor *Posadas* compels us to craft an exception to the *Central Hudson* standard, for in both of those cases we applied the *Central Hudson* analysis. Indeed, *Edge Broadcasting* specifically avoided reaching the argument the Government makes here because the Court found that the regulation in question passed muster under *Central Hudson*. 509 U. S., at 425. To be sure, *Posadas* did state that the Puerto Rico Government could ban promotional advertising of casino gambling because it could have prohibited gambling altogether. 478 U. S., at 346. But the Court reached this argument only *after* it already had found that the state regulation survived the *Central Hudson* test. See 478 U. S., at 340–344. The Court raised the Government's point in response to an alternative claim that Puerto Rico's regulation was inconsistent with *Carey* v. *Population Services Int'l*, 431 U. S. 678 (1977), and *Bigelow* v. *Virginia*, 421 U. S. 809 (1975). *Posadas, supra*, at 345–346.

Nor does *LaRue* support the Government's position. *LaRue* did not involve commercial speech about alcohol, but instead concerned the regulation of nude dancing in places where alcohol was served. 409 U. S., at 114.

who selects a beverage because of its high potency—from choosing beers solely for their alcohol content. In the Government's view, restricting disclosure of information regarding a particular product characteristic will decrease the extent to which consumers will select the product on the basis of that characteristic.

Respondent counters that Congress actually intended the FAAA to achieve the far different purpose of preventing brewers from making inaccurate claims concerning alcohol content. According to respondent, when Congress passed the FAAA in 1935, brewers did not have the technology to produce beer with alcohol levels within predictable tolerances—a skill that modern beer producers now possess. Further, respondent argues that the true policy guiding federal alcohol regulation is not aimed at suppressing strength wars. If such were the goal, the Government would not pursue the opposite policy with respect to wines and distilled spirits. Although § 205(e)(2) requires BATF to promulgate regulations barring the disclosure of alcohol content on beer labels, it also orders BATF to *require* the disclosure of alcohol content on the labels of wines and spirits. See 27 CFR § 4.36 (1994) (wines); § 5.37 (distilled spirits).

Rather than suppressing the free flow of factual information in the wine and spirits markets, the Government seeks to control competition on the basis of strength by monitoring distillers' promotions and marketing. Respondent quite correctly notes that the general thrust of federal alcohol policy appears to favor greater disclosure of information, rather than less. This also seems to be the trend in federal regulation of other consumer products as well. See, *e. g.*, Nutrition Labeling and Education Act of 1990, Pub. L. 101–535, 104 Stat. 2353, as amended (requiring labels of food products sold in the United States to display nutritional information).

Respondent offers a plausible reading of the purpose behind § 205(e)(2), but the prevention of misleading statements of alcohol content need not be the exclusive Government in-

terest served by § 205(e)(2). In *Posadas de Puerto Rico Associates* v. *Tourism Co. of P. R.*, 478 U. S. 328, 341 (1986), we found that the Puerto Rico Legislature's interest in promoting the health, safety, and welfare of its citizens by reducing their demand for gambling provided a sufficiently "substantial" governmental interest to justify the regulation of gambling advertising. So too the Government here has a significant interest in protecting the health, safety, and welfare of its citizens by preventing brewers from competing on the basis of alcohol strength, which could lead to greater alcoholism and its attendant social costs. Both panels of the Court of Appeals that heard this case concluded that the goal of suppressing strength wars constituted a substantial interest, and we cannot say that their conclusion is erroneous. We have no reason to think that strength wars, if they were to occur, would not produce the type of social harm that the Government hopes to prevent.

The Government attempts to bolster its position by arguing that the labeling ban not only curbs strength wars, but also "facilitates" state efforts to regulate alcohol under the Twenty-first Amendment. The Solicitor General directs us to *United States* v. *Edge Broadcasting Co.*, 509 U. S. 418 (1993), in which we upheld a federal law that prohibited lottery advertising by radio stations located in States that did not operate lotteries. That case involved a station located in North Carolina (a nonlottery State) that broadcast lottery advertisements primarily into Virginia (a State with a lottery). We upheld the statute against First Amendment challenge in part because it supported North Carolina's anti-gambling policy without unduly interfering with States that sponsored lotteries. *Id.*, at 431–435. In this case, the Government claims that the interest behind § 205(e)(2) mirrors that of the statute in *Edge Broadcasting* because it prohibits disclosure of alcohol content only in States that do not affirmatively require brewers to provide that information. In the Government's view, this saves States that might wish to

ban such labels the trouble of enacting their own legislation, and it discourages beer drinkers from crossing state lines to buy beer they believe is stronger.

We conclude that the Government's interest in preserving state authority is not sufficiently substantial to meet the requirements of *Central Hudson*. Even if the Federal Government possessed the broad authority to facilitate state powers, in this case the Government has offered nothing that suggests that States are in need of federal assistance. States clearly possess ample authority to ban the disclosure of alcohol content—subject, of course, to the same First Amendment restrictions that apply to the Federal Government. Unlike the situation in *Edge Broadcasting*, the policies of some States do not prevent neighboring States from pursuing their own alcohol-related policies within their respective borders. One State's decision to permit brewers to disclose alcohol content on beer labels will not preclude neighboring States from effectively banning such disclosure of that information within their borders.

## B

The remaining *Central Hudson* factors require that a valid restriction on commercial speech directly advance the governmental interest and be no more extensive than necessary to serve that interest. We have said that "[t]he last two steps of the *Central Hudson* analysis basically involve a consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those ends." *Posadas, supra,* at 341. The Tenth Circuit found that § 205(e)(2) failed to advance the interest in suppressing strength wars sufficiently to justify the ban. We agree.

Just two Terms ago, in *Edenfield* v. *Fane*, 507 U. S. 761 (1993), we had occasion to explain the *Central Hudson* factor concerning whether the regulation of commercial speech "directly advances the governmental interest asserted." *Central Hudson*, 447 U. S., at 566. In *Edenfield*, we decided

that the Government carries the burden of showing that the challenged regulation advances the Government's interest "in a direct and material way." 507 U. S., at 767. That burden "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.*, at 770–771. We cautioned that this requirement was critical; otherwise, "a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression." *Id.*, at 771.

The Government attempts to meet its burden by pointing to current developments in the consumer market. It claims that beer producers are already competing and advertising on the basis of alcohol strength in the "malt liquor" segment of the beer market.[3] The Government attempts to show that this competition threatens to spread to the rest of the market by directing our attention to respondent's motives in bringing this litigation. Respondent allegedly suffers from consumer misperceptions that its beers contain less alcohol than other brands. According to the Government, once respondent gains relief from § 205(e)(2), it will use its labels to overcome this handicap.

Under the Government's theory, § 205(e)(2) suppresses the threat of such competition by preventing consumers from choosing beers on the basis of alcohol content. It is assuredly a matter of "common sense," Brief for Petitioner 27, that a restriction on the advertising of a product characteristic will decrease the extent to which consumers select a product on the basis of that trait. In addition to common sense, the Government urges us to turn to history as a guide. Ac-

---

[3] "'Malt liquor' is the term used to designate those malt beverages with the highest alcohol content . . . . Malt liquors represent approximately three percent of the malt beverage market." *Adolph Coors Co.* v. *Bentsen*, 2 F. 3d 355, 358, n. 4 (CA10 1993).

cording to the Government, at the time Congress enacted the FAAA, the use of labels displaying alcohol content had helped produce a strength war. Section 205(e)(2) allegedly relieved competitive pressures to market beer on the basis of alcohol content, resulting over the long term in beers with lower alcohol levels.

We conclude that § 205(e)(2) cannot directly and materially advance its asserted interest because of the overall irrationality of the Government's regulatory scheme. While the laws governing labeling prohibit the disclosure of alcohol content unless required by state law, federal regulations apply a contrary policy to beer advertising. 27 U. S. C. § 205(f)(2); 27 CFR § 7.50 (1994). Like § 205(e)(2), these restrictions prohibit statements of alcohol content in advertising, but, unlike § 205(e)(2), they apply only in States that affirmatively prohibit such advertisements. As only 18 States at best prohibit disclosure of content in advertisements, App. to Brief for Respondent 1a–12a, brewers remain free to disclose alcohol content in advertisements, but not on labels, in much of the country. The failure to prohibit the disclosure of alcohol content in advertising, which would seem to constitute a more influential weapon in any strength war than labels, makes no rational sense if the Government's true aim is to suppress strength wars.

Other provisions of the FAAA and its regulations similarly undermine § 205(e)(2)'s efforts to prevent strength wars. While § 205(e)(2) bans the disclosure of alcohol content on beer labels, it allows the exact opposite in the case of wines and spirits. Thus, distilled spirits may contain statements of alcohol content, 27 CFR § 5.37 (1994), and such disclosures are required for wines with more than 14 percent alcohol, 27 CFR § 4.36 (1994). If combating strength wars were the goal, we would assume that Congress would regulate disclosure of alcohol content for the strongest beverages as well as for the weakest ones. Further, the Government permits brewers to signal high alcohol content through use

of the term "malt liquor." Although the Secretary has proscribed the use of various colorful terms suggesting high alcohol levels, 27 CFR § 7.29(f) (1994), manufacturers still can distinguish a class of stronger malt beverages by identifying them as malt liquors. One would think that if the Government sought to suppress strength wars by prohibiting numerical disclosures of alcohol content, it also would preclude brewers from indicating higher alcohol beverages by using descriptive terms.

While we are mindful that respondent only appealed the constitutionality of § 205(e)(2), these exemptions and inconsistencies bring into question the purpose of the labeling ban. To be sure, the Government's interest in combating strength wars remains a valid goal. But the irrationality of this unique and puzzling regulatory framework ensures that the labeling ban will fail to achieve that end. There is little chance that § 205(e)(2) can directly and materially advance its aim, while other provisions of the same Act directly undermine and counteract its effects.

This conclusion explains the findings of the courts below. Both the District Court and the Court of Appeals found that the Government had failed to present any credible evidence showing that the disclosure of alcohol content would promote strength wars. In the District Court's words, "none of the witnesses, none of the depositions that I have read, no credible evidence that I have heard, lead[s] me to believe that giving alcoholic content on labels will in any way promote . . . strength wars." App. to Pet. for Cert. A–38. See also *Bentsen*, 2 F. 3d, at 359. Indeed, the District Court concluded that "[p]rohibiting the alcoholic content disclosure of malt beverages on labels has little, if anything, to do with the type of advertising that promotes strength wars." App. to Pet. for Cert. A–36.[4] As the FAAA's exceptions and reg-

---

[4] Not only was there little evidence that American brewers intend to increase alcohol content, but the lower courts also found that "in the United States . . . the vast majority of consumers . . . value taste and

ulations would have counteracted any effect the labeling ban had exerted, it is not surprising that the lower courts did not find any evidence that § 205(e)(2) had suppressed strength wars.

The Government's brief submits anecdotal evidence and educated guesses to suggest that competition on the basis of alcohol content is occurring today and that § 205(e)(2)'s ban has constrained strength wars that otherwise would burst out of control. These various tidbits, however, cannot overcome the irrationality of the regulatory scheme and the weight of the record. The Government did not offer any convincing evidence that the labeling ban has inhibited strength wars. Indeed, it could not, in light of the effect of the FAAA's other provisions. The absence of strength wars over the past six decades may have resulted from any number of factors.

Nor do we think that respondent's litigating positions can be used against it as proof that the Government's regulation is necessary. That respondent wishes to disseminate factual information concerning alcohol content does not demonstrate that it intends to compete on the basis of alcohol content. Brewers may have many different reasons—only one of which might be a desire to wage a strength war—why they wish to disclose the potency of their beverages.

Even if § 205(e)(2) did meet the *Edenfield* standard, it would still not survive First Amendment scrutiny because the Government's regulation of speech is not sufficiently tailored to its goal. The Government argues that a sufficient "fit" exists here because the labeling ban applies to only one product characteristic and because the ban does not prohibit all disclosures of alcohol content—it applies only to those involving labeling and advertising. In response, respondent suggests several alternatives, such as directly limiting the alcohol content of beers, prohibiting marketing efforts em-

lower calories—both of which are adversely affected by increased alcohol strength." *Bentsen,* 2 F. 3d, at 359; accord, App. to Pet. for Cert. A–37.

phasizing high alcohol strength (which is apparently the policy in some other western nations), or limiting the labeling ban only to malt liquors, which is the segment of the market that allegedly is threatened with a strength war. We agree that the availability of these options, all of which could advance the Government's asserted interest in a manner less intrusive to respondent's First Amendment rights, indicates that § 205(e)(2) is more extensive than necessary.

## IV

In sum, although the Government may have a substantial interest in suppressing strength wars in the beer market, the FAAA's countervailing provisions prevent § 205(e)(2) from furthering that purpose in a direct and material fashion. The FAAA's defects are further highlighted by the availability of alternatives that would prove less intrusive to the First Amendment's protections for commercial speech. Because we find that § 205(e)(2) fails the *Central Hudson* test, we affirm the decision of the court below.

*It is so ordered.*

JUSTICE STEVENS, concurring in the judgment.

Although I agree with the Court's persuasive demonstration that this statute does not serve the Government's purported interest in preventing "strength wars," I write separately because I am convinced that the constitutional infirmity in the statute is more patent than the Court's opinion indicates. Instead of relying on the formulaic approach announced in *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980), I believe the Court should ask whether the justification for allowing more regulation of commercial speech than other speech has any application to this unusual statute.

In my opinion the "commercial speech doctrine" is unsuited to this case, because the Federal Alcohol Administra-

tion Act (FAAA) neither prevents misleading speech nor protects consumers from the dangers of incomplete information. A truthful statement about the alcohol content of malt beverages would receive full First Amendment protection in any other context; without some justification tailored to the special character of commercial speech, the Government should not be able to suppress the same truthful speech merely because it happens to appear on the label of a product for sale.

I

The First Amendment generally protects the right not to speak as well as the right to speak. See *McIntyre* v. *Ohio Elections Comm'n, ante,* at 342; *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974); cf. *Wallace* v. *Jaffree,* 472 U. S. 38, 51–52 (1985). In the commercial context, however, government is not only permitted to prohibit misleading speech that would be protected in other contexts, *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748, 771–772 (1976), but it often requires affirmative disclosures that the speaker might not make voluntarily.[1] The regulation of statements about alcohol content in the statute before us today is a curious blend of prohibitions and requirements. It prohibits the disclosure of the strength of some malt beverages while requiring the disclosure of the strength of vintage wines. In my judgment the former prohibition is just as unacceptable in a commercial context as in any other because it is not supported by the rationales for treating commercial speech differently under

---

[1] See *In re R. M. J.,* 455 U. S. 191, 201 (1982) ("[A] warning or disclaimer might be appropriately required . . . in order to dissipate the possibility of consumer confusion or deception"), citing *Bates* v. *State Bar of Ariz.,* 433 U. S. 350, 375 (1977); see also 15 U. S. C. § 1333 (requiring "Surgeon General's Warning" labels on cigarettes); 21 U. S. C. § 343 (1988 ed. and Supp. V) (setting labeling requirements for food products); 21 U. S. C. § 352 (1988 ed. and Supp. V) (setting labeling requirements for drug products); 15 U. S. C. § 77e (requiring registration statement before selling securities).

the First Amendment: that is, the importance of avoiding deception and protecting the consumer from inaccurate or incomplete information in a realm in which the accuracy of speech is generally ascertainable by the speaker.

I am willing to assume that an interest in avoiding the harmful consequences of so-called "strength wars" would justify disclosure requirements explaining the risks and predictable harms associated with the consumption of alcoholic beverages. Such a measure could be justified as a means to ensure that consumers are not led, by incomplete or inaccurate information, to purchase products they would not purchase if they knew the truth about them. I see no basis, however, for upholding a prohibition against the dissemination of truthful, nonmisleading information about an alcoholic beverage merely because the message is propounded in a commercial context.

## II

The Court's continued reliance on the misguided approach adopted in *Central Hudson* makes this case appear more difficult than it is. In *Central Hudson*, the Court held that commercial speech is categorically distinct from other speech protected by the First Amendment. 447 U. S., at 561–566, and n. 5. Defining "commercial speech," alternatively, as "expression related solely to the economic interests of the speaker and its audience," *id.*, at 561, and as " 'speech proposing a commercial transaction,'" *id.*, at 562, quoting *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 455–456 (1978), the Court adopted its much-quoted four-part test for determining when the government may abridge such expression. In my opinion the borders of the commercial speech category are not nearly as clear as the Court has assumed, and its four-part test is not related to the reasons for allowing more regulation of commercial speech than other speech. See *Central Hudson*, 447 U. S., at 579–582 (STEVENS, J., concurring in judgment).

The case before us aptly demonstrates the artificiality of a rigid commercial/noncommercial distinction. The speech at issue here is an unadorned, accurate statement, on the label of a bottle of beer, of the alcohol content of the beverage contained therein. This, the majority finds, *ante*, at 481–482, is "commercial speech." The majority does not explain why the words "4.73% alcohol by volume"[2] are commercial. Presumably, if a nonprofit consumer protection group were to publish the identical statement, "Coors beer has 4.73% alcohol by volume," on the cover of a magazine, the Court would not label the speech "commercial." It thus appears, from the facts of this case, that whether or not speech is "commercial" has no necessary relationship to its content. If the Coors label is commercial speech, then, I suppose it must be because (as in *Central Hudson*) the motivation of the speaker is to sell a product, or because the speech tends to induce consumers to buy a product.[3] Yet, economic motivation or impact alone cannot make speech less deserving of constitutional protection, or else all authors and artists who sell their works would be correspondingly disadvantaged. Neither can the value of speech be diminished solely because of its placement on the label of a product. Surely a piece of newsworthy information on the cover of a magazine, or a book review on the back of a book's dust jacket, is entitled to full constitutional protection.

As a matter of common sense, any description of commercial speech that is intended to identify the category of speech entitled to less First Amendment protection should relate to the reasons for permitting broader regulation: namely, commercial speech's potential to mislead. See *Virginia Bd. of*

[2] The 4.73 percent figure comes from an "[i]ndependent [l]aboratory [a]nalysis" of Coors beer cited in a Coors advertisement. App. 65.

[3] The inducement rationale might also apply to a consumer protection publication, if it is sold on a newsrack, as some consumers will buy the publication because they wish to learn the varying alcohol contents of competing products.

*Pharmacy,* 425 U. S., at 771–772; *Bates,* 433 U. S., at 383–384; *Bolger* v. *Youngs Drug Products Corp.,* 463 U. S. 60, 81–83 (1983) (STEVENS, J., concurring in judgment); see also *Cincinnati* v. *Discovery Network, Inc.,* 507 U. S. 410, 426 (1993) (city's regulation of commercial speech bore no relationship to reasons why commercial speech is entitled to less protection). Although some false and misleading statements are entitled to First Amendment protection in the political realm, see, *e. g., Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323 (1974); *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), the special character of commercial expression justifies restrictions on misleading speech that would not be tolerated elsewhere. As Justice Stewart explained:

> "In contrast to the press, which must often attempt to assemble the true facts from sketchy and sometimes conflicting sources under the pressure of publication deadlines, the commercial advertiser generally knows the product or service he seeks to sell and is in a position to verify the accuracy of his factual representations before he disseminates them. The advertiser's access to the truth about his product and its price substantially eliminates any danger that government regulation of false or misleading price or product advertising will chill accurate and nondeceptive commercial expression. There is, therefore, little need to sanction 'some falsehood in order to protect speech that matters.'" *Virginia Bd. of Pharmacy,* 425 U. S., at 777–778 (concurring opinion), quoting *Gertz* v. *Robert Welch, Inc.,* 418 U. S., at 341.[4]

---

[4] Justice Stewart's reasoning has been the subject of scholarly criticism, on the ground that some speech surrounding a commercial transaction is not readily verifiable, while some political speech is easily verifiable by the speaker. See Farber, Commercial Speech and First Amendment Theory, 74 Nw. U. L. Rev. 372, 385–386 (1979). Although I agree that Justice Stewart's distinction will not extend to every instance of expression, I think his theory makes good sense as a general rule. Most of the time, if

See also *Bates*, 433 U. S., at 383.

Not only does regulation of inaccurate commercial speech exclude little truthful speech from the market, but false or misleading speech in the commercial realm also lacks the value that sometimes inheres in false or misleading political speech. Transaction-driven speech usually does not touch on a subject of public debate, and thus misleading statements in that context are unlikely to engender the beneficial public discourse that flows from political controversy. Moreover, the consequences of false commercial speech can be particularly severe: Investors may lose their savings, and consumers may purchase products that are more dangerous than they believe or that do not work as advertised. Finally, because commercial speech often occurs in the place of sale, consumers may respond to the falsehood before there is time for more speech and considered reflection to minimize the risks of being misled. See *Ohralik*, 436 U. S., at 447, 457–458 (distinguishing in-person attorney solicitation of clients from written solicitation). The evils of false commercial speech, which may have an immediate harmful impact on commercial transactions, together with the ability of purveyors of commercial speech to control falsehoods, explain why we tolerate more governmental regulation of this speech than of most other speech.

In this case, the Government has not identified a sufficient interest in suppressing the truthful, unadorned, informative speech at issue here. If Congress had sought to regulate all statements of alcohol content (say, to require that they be of a size visible to consumers or that they provide specific

---

a seller is representing a fact or making a prediction about his product, the seller will know whether his statements are false or misleading and he will be able to correct them. On the other hand, the purveyor of political speech is more often (though concededly not always) an observer who is in a poor position to verify its truth. The paradigm example of this latter phenomenon is, of course, the journalist who must rely on confidential sources for his information.

information for comparative purposes) in order to prevent brewers from misleading consumers as to the true alcohol content of their beverages, then this would be a different case. But absent that concern, I think respondent has a constitutional right to give the public accurate information about the alcoholic content of the malt beverages that it produces. I see no reason why the fact that such information is disseminated on the labels of respondent's products should diminish that constitutional protection. On the contrary, the statute at issue here should be subjected to the same stringent review as any other content-based abridgment of protected speech.

## III

Whatever standard is applied, I find no merit whatsoever in the Government's assertion that an interest in restraining competition among brewers to satisfy consumer demand for stronger beverages justifies a statutory abridgment of truthful speech. Any "interest" in restricting the flow of accurate information because of the perceived danger of that knowledge is anathema to the First Amendment; more speech and a better informed citizenry are among the central goals of the Free Speech Clause. Accordingly, the Constitution is most skeptical of supposed state interests that seek to keep people in the dark for what the government believes to be their own good. See *Virginia Bd. of Pharmacy*, 425 U. S., at 769–770; *Bates*, 433 U. S., at 374–375. One of the vagaries of the "commercial speech" doctrine in its current form is that the Court sometimes takes such paternalistic motives seriously. See *United States* v. *Edge Broadcasting Co.*, 509 U. S. 418, 439–440 (1993) (STEVENS, J., dissenting); *Posadas de Puerto Rico Associates* v. *Tourism Co. of P. R.*, 478 U. S. 328, 358 (1986) (Brennan, J., dissenting).

In my opinion, the Government's asserted interest, that consumers should be misled or uninformed for their own protection, does not suffice to justify restrictions on protected speech in *any* context, whether under "exacting scrutiny" or

some other standard. If Congress is concerned about the potential for increases in the alcohol content of malt beverages, it may, of course, take other steps to combat the problem without running afoul of the First Amendment—for example, Congress may limit directly the alcoholic content of malt beverages. But Congress may not seek to accomplish the same purpose through a policy of consumer ignorance, at the expense of the free-speech rights of the sellers and purchasers. See *Virginia Bd. of Pharmacy,* 425 U. S., at 756–757. If varying alcohol strengths are lawful, I see no reason why brewers may not advise customers that their beverages are stronger—or weaker—than competing products.

In my opinion, this statute is unconstitutional because, regardless of the standard of review, the First Amendment mandates rejection of the Government's proffered justification for this restriction. Although some regulations of statements about alcohol content that *increase* consumer awareness would be entirely proper, this statutory provision is nothing more than an attempt to blindfold the public.

Accordingly, I concur in the Court's judgment.