III. ANALYSIS
Plaintiffs challenge § 26820 as unconstitutional under the First Amendment, both on its face and as applied. (ECF No. 22 ¶ 37.) To succeed in a facial challenge, "the challenger must establish that no set of circumstances exists under which the [statute] would be valid." United States v. Salerno , 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). The Government, conversely, argues the law survives intermediate scrutiny and therefore is not unconstitutional. (ECF No. 52 at 16-17.) The Supreme Court has set out a four-part test to guide the constitutional analysis of commercial speech.
At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.
Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y. , 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). If the Court finds that the affected speech is not misleading or related to unlawful activity, "the government bears the burden of showing that it has a substantial interest, that the restriction directly advances that interest and that the restriction is not more extensive than necessary to serve the interest." Valle Del Sol Inc. v. Whiting , 709 F.3d 808, 816 (9th Cir. 2013).
A. Whether the Speech Concerns Lawful Activity and Is Nonmisleading
To qualify for First Amendment protection, the Court must first determine whether the commercial speech concerns lawful activity and is not misleading. Cent. Hudson , 447 U.S. at 566, 100 S.Ct. 2343. The parties agree that on-site handgun advertisements concern lawful activity-purchasing a handgun from a licensed dealer-and are not misleading. (ECF No. 51-1 at 13; ECF No. 52 at 14.) Indeed, not only is purchasing a handgun from a licensed dealer lawful, it is constitutionally protected. Dist. of Columbia v. Heller , 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Therefore, the first prong of the Central Hudson test is satisfied.
B. Whether the Government's Interests Are Substantial
Next, the Government must demonstrate that "the asserted governmental interest is substantial." Cent. Hudson , 447 U.S. at 566, 100 S.Ct. 2343. Here, the Government advances two interests in support of its argument that § 26820 withstands First Amendment scrutiny. First, the Government asserts it has a substantial interest in reducing handgun suicide. (ECF No. 52 at 18.) Second, the Government asserts it has a substantial interest in reducing handgun crime. (ECF No. 52 *1013 at 23.) Plaintiffs do not dispute these are substantial governmental interests. (See ECF No. 51-1 at 13; ECF No. 55 at 5-6.) Therefore, the Court assumes that the Government's stated interests are substantial.
C. Whether § 26820 Directly and Materially Advances the Governmental Interests Asserted
The third prong of the Central Hudson test requires the Government to show that "the speech restriction directly and materially advances the asserted governmental interest[s]." Greater New Orleans Broad. Ass'n v. United States , 527 U.S. 173, 188, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999). This prong is "critical; otherwise, 'a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.' " Rubin v. Coors Brewing Co. , 514 U.S. 476, 487, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995) (quoting Edenfield v. Fane , 507 U.S. 761, 771, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) ). "It is well established that 'the party seeking to uphold a restriction on commercial speech carries the burden of justifying it.' " Edenfield , 507 U.S. at 770, 113 S.Ct. 1792 (quoting Bolger v. Youngs Drug Prods. Corp. , 463 U.S. 60, 71 n.20, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) ). This burden requires more than "mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." Id. at 770-71, 113 S.Ct. 1792. Courts will not sustain a regulation if it " 'provides only ineffective or remote support for the government's purpose' or if there is 'little chance' that the restriction will advance the State's goal." Lorillard Tobacco Co. v. Reilly , 533 U.S. 525, 566, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (citation omitted) (quoting Greater New Orleans Broad. , 527 U.S. at 193, 119 S.Ct. 1923 ; Edenfield , 507 U.S. at 770, 113 S.Ct. 1792 ). However, the Government need not produce empirical data to support its conclusion that a speech restriction is necessary. Florida Bar v. Went For It, Inc. , 515 U.S. 618, 628, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995). Instead, it may rely on "history, consensus, and 'simple common sense.' " Id. (quoting Burson v. Freeman , 504 U.S. 191, 211, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) ).
The Government argues that § 26820 directly advances its "interest in decreasing handgun suicides because the law inhibits handgun purchases by people with impulsive personality traits, who, as a group, are at a higher risk for suicide than the population in general." (ECF No. 52 at 18.) The Government argues its objective of preventing handgun suicides is achieved in two steps. "First, the advertisements restricted by section 26820 inhibit purchases by people with impulsive personality traits, a conclusion supported by Professor Gundlach's expert report." (ECF No. 52 at 18.) "[S]econd, people with impulsive personality traits are at a higher risk for committing suicide, a conclusion supported by Professor Mann's expert report." (ECF No. 52 at 18.) The Government argues suicide is the leading cause of death for purchasers in the year after a handgun purchase, thus California's ten-day waiting period, Cal. Penal Code §§ 26815(a), 27540(a), is not entirely effective. (ECF No. 52 at 21.) In fact, according to the Government's expert, "[g]uns used for suicide are bought a mean of 11 years before the suicide." (ECF No. 43-2 ¶ 30 (emphasis added).) The Government's argument that § 26820 directly advances its interest in handgun crime follows a similar vein-advertisements restricted by § 26820 tend to induce purchase by people with impulsive personality traits, and impulsive people are more likely to engage in crime. (ECF No. 52 at 23-24.) Thus, the *1014 Government's theory is essentially that an impulsive person will see a handgun sign outside a store, will impulsively buy the gun (although the Government does not identify a specific purpose for the purchase), and then, at some unspecified future time likely years later, the person's impulsive temperament will lead him to impulsively misuse the handgun that he bought in response to seeing the sign.
The Government claims § 26820 directly advances both its interests because it inhibits people with "impulsive personality traits" from purchasing a handgun in the first place. (ECF No. 52 at 18; ECF No. 56 at 8.) However, the Supreme Court has rejected this highly paternalistic approach to limiting speech, holding that the Government may not "achieve its policy objectives through the indirect means of restraining certain speech by certain speakers." Sorrell v. IMS Health Inc. , 564 U.S. 552, 577, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011). The Supreme Court has reiterated that the Government cannot justify content-burdens on speech based on the "fear that people would make bad decisions if given truthful information." Id. (quoting Thompson v. W. States Med. Ctr. , 535 U.S. 357, 374, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002) ). "Precisely because bans against truthful, nonmisleading commercial speech rarely seek to protect consumers from either deception or overreaching, they usually rest solely on the offensive assumption that the public will respond 'irrationally' to the truth." 44 Liquormart v. Rhode Island , 517 U.S. 484, 503, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (plurality opinion). For this reason, "[t]he First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." Id. The Government "may not seek to remove a popular but disfavored product from the marketplace by prohibiting truthful, nonmisleading advertisements that contain impressive endorsements or catchy jingles." Sorrell , 564 U.S. at 577-78, 131 S.Ct. 2653. That the Government "finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." Id. at 578, 131 S.Ct. 2653.
Yet, this is exactly what the Government seeks to do. The Government aims to stop a group of law-abiding adults with the shared personality trait of "impulsiveness" from making what it sees the bad decision of purchasing a handgun. The Government believes if it can inhibit such persons from making the initial decision to purchase a handgun, it will save them from harming themselves or others with the handgun at some later date, likely years from the initial purchase. However, the Government may not restrict speech that persuades adults, who are neither criminals nor suffer from mental illness, from purchasing a legal and constitutionally-protected product, merely because it distrusts their personality trait and the decisions that personality trait may lead them to make later down the road. Moreover, in the effort to restrict impulsive individuals from purchasing handguns, the Government has restricted speech to all adults, irrespective of whether they have this personality trait.[1] Therefore, the Government impermissibly seeks to achieve its goals through the indirect means of restricting certain speech by certain speakers based on the fear that a certain subset of the population with a particular personality *1015 trait could potentially make what the Government contends is a bad decision.
In addition to the Supreme Court's rejection of this type of approach, § 26820 is fatally underinclusive. "[U]nderinclusivity is relevant to Central Hudson's direct advancement prong because it 'may diminish the credibility of the government's rationale for restricting speech in the first place.' " Valle Del Sol , 709 F.3d at 824 (quoting Metro Lights, L.L.C. v. City of Los Angeles , 551 F.3d 898, 905 (9th Cir. 2009) ). For example, in Pitt News v. Pappert , 379 F.3d 96 (3d Cir. 2004), the Third Circuit struck down a law restricting alcohol advertising in publications directly targeted to college students. The Court held that the law "applie[d] only to advertising in a very narrow sector of the media," and the state failed to show that "eliminating ads in [a] narrow sector [of the media] will do any good" because students "will still be exposed to a torrent of beer ads on television and the radio, and they will still see alcoholic beverage ads in other publications," including other publications displayed on campus. Id. at 107. The Ninth Circuit recently addressed a similar issue in Retail Digital Network, LLC v. Prieto , 861 F.3d 839, 851 (9th Cir. 2017), holding that restricting only a "small portion" of alcohol advertising visible to consumers could not directly and materially advance the government's purported interest in promoting temperance. The Government offers no meaningful distinction between this case and Pitt News . Plaintiffs could display a large neon sign reading "GUNS GUNS GUNS" or a 15-foot depiction of a modern sporting rifle, and this would be permissible. Moreover, Plaintiffs are free to advertise through any other channels of communication. This includes a print advertisement with a map to the store, a billboard with directions to the store (which could be blocks away), or a radio jingle that makes it easy to find the store. The underinclusivity of this law gravely diminishes the credibility of the Government's rationale.
More fundamentally, however, the Government has not demonstrated that § 26820 would have any effect on handgun suicide or violence. The Government's first expert, Professor Gregory T. Gundlach, opines that "it is reasonable to conclude that the display of a handgun or imitation handgun or placard advertising the sale or other transfer thereof, in any part of the premises of a California licensed handgun seller, that can be readily seen from the outside, contributes in a positive way to the impulsive purchase of handguns." (ECF No. 43-1 ¶ 10.) Professor Gundlach defines an "impulsive purchase" as "an unplanned and sudden buying act, in response to subjective or external stimuli, accompanied by a powerful and persistent urge." (ECF No. 43-1 ¶ 31.) According to Professor Gundlach, "[i]mpulse buying is distinguished from other forms of buying based on the fact that it is primarily driven by strong hedonic temptations of immediate satisfaction and improved mood with little or no regard for consequences." (ECF No. 43-1 ¶ 34.)
In reaching his conclusion, Professor Gundlach relies on studies of impulsive purchases generally. (ECF No. 43-1 ¶¶ 32, 50-52.) The question, however, is not whether advertising restrictions can generally reduce impulsive purchases, but rather whether § 26820 directly and materially advances the Government's interest in reducing handgun purchases among impulsive people and in turn the risk of handgun suicide or crime. The little evidence Professor Gundlach relies on to tie impulsive purchases to handguns includes a remark by a firearm manufacturer's executive during an earnings call, a passing mention in an industry publication, and two commenters on firearms blogs. (ECF No. 43-1 ¶ 33.) This evidence is trivial. Notably, it is *1016 unclear whether the use of the word "impulse" in any of these scenarios refers to the same "impulse" referred to by Professor Gundlach. Further, a study Professor Gundlach relies on explains that firearms fall into a product category least likely to involve impulse purchasing. See Clinton Amos et al., A Meta-Analysis of Consumer Impulse Buying , 31 J. Retailing & Consumer Servs. 86 (2014) ("An examination of product type did produce substantial difference as impulse buying was greater for fashion merchandise than supermarket purchases and general merchandise."). Handguns are substantially different from most purchases, both in terms of product type and cost. However, none of the studies Professor Gundlach relies on specifically address the impact of advertising on impulse purchases of handguns, let alone the impact specifically caused by the signage prohibited by § 26820. Nor does Professor Gundlach explain why the impulse purchases of handguns would be similar to other products. He similarly fails to address whether California handgun purchase regulations, such as the ten-day waiting period or required firearms law and safety test, would have an impact on impulsive handgun purchases. Thus, Professor Gundlach's data simply does not reveal that § 26820 reduces impulsive handgun purchases, let alone to a material degree.
The Government does not satisfy its burden of materiality on a content-based commercial speech restriction by procuring an expert who, after citing some statistics and studies not directly related to the issue at hand, merely finds it "reasonable to conclude" that a statute does what the Government says it does and fails to express any opinion regarding the magnitude of this conclusion. See 44 Liquormart , 517 U.S. at 506, 116 S.Ct. 1495 (plurality opinion) (holding the government failed to meet the direct advancement prong when it "presented no evidence to suggest that its speech prohibition [would] significantly reduce marketwide consumption" of alcohol). At best, Professor Gundlach's opinion provides "only ineffective or remote support for the government's purpose," which, of course, is not enough under Central Hudson . Cent. Hudson , 447 U.S. at 564, 100 S.Ct. 2343. Rather, the Government "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." Edenfield , 507 U.S. at 771, 113 S.Ct. 1792.[2] Thus, the Government fails to demonstrate § 26820 affects impulsive handgun purchases to a material degree.
The Government next relies on the opinion of Professor J. John Mann to demonstrate that "people with impulsive personality traits are at a higher risk for committing suicide." (ECF No. 52 at 18.) Particularly, "Professor Mann offers the opinion that people with impulsive personality traits are more likely to make a suicide attempt and that having a handgun in the home further increases the risk that they will." (ECF No. 52 at 20.) Professor Mann goes on to explain that "[s]uicidal behavior is generally impulsive and 70% of suicide attempters act less than one hour after deciding to kill themselves." (ECF No. 43-2 ¶ 24.) Professor Mann did not study the effect of § 26820 on impulsive handgun purchases, but rather assumes that if the invalidation of § 26820 would result in an increase in handgun purchases *1017 by people with impulsive personality traits, if § 26820 were invalidated, "it would result in more handgun suicides in direct proportion to the increase in handgun purchases by a vulnerable subgroup of the general population characterized by more pronounced impulsive personality traits." (ECF No. 43-2 ¶ 15.) The Government also cites several studies that found handgun purchases are associated with an increased risk of suicide for the purchaser and members of the purchaser's household. (ECF No. 52 at 21.)
Both Professor Mann's report and the studies the Government cite conclude that impulsive personality traits increase the risk of suicide or are associated with suicide. Plaintiffs do not challenge the accuracy of these conclusions, (ECF No. 55-2 at 24-25), but instead, challenge what they mean. (ECF No. 55 at 20.) Even if these conclusions are valid, they both fail to demonstrate to any degree whether people who impulsively purchase handguns, as opposed to those who non-impulsively purchase handguns or obtain a handgun through means other than store purchase, commit suicide with that handgun. In other words, the Government fails to make the link that impulsive handgun purchases result in impulsive handgun suicides. In fact, according to Professor Mann, the most relevant factor in handgun suicide is not whether the person who commits suicide purchases the handgun (let alone whether they impulsively purchase the handgun), but rather is whether a firearm is available in the home. (ECF No. 55-1 at 28 ("The gun in the house is what places people at risk. It's not necessarily whether they bought the gun or another family member bought the gun.").) Professor Mann's opinion thus focuses on the general notion that fewer handguns means less handgun suicide, rather than whether restricting impulsive handgun purchases would reduce handgun suicides. (See ECF No. 43-2 ¶ 33 ("The more handguns that are purchased the more handgun suicides will happen.").) But, the Court already held that the Government may not advance its asserted interests by demonstrating that as a general matter fewer handguns results in less handgun crime and violence. (ECF No. 32 at 10.) Ultimately, the Government fails to show that § 26820 has any direct or material effect on reducing handgun suicides because it fails to bridge the gap between those who impulsively purchase handguns and those who impulsively commit suicide with a handgun. Instead, the Government relies on mere speculation and conjecture. Accordingly, the Government fails to demonstrate that an impulsive handgun purchase results in an impulsive handgun suicide, i.e., that an impulsive handgun purchase is actually a "bad decision."
Although the bulk of the Government's argument focuses on suicide, the Government still maintains, as it did in the preliminary injunction stage, that § 26820 also directly advances California's interest in reducing handgun crimes. (ECF No. 52 at 23-24.) The Government still, however, has not produced evidence that § 26820 reduces impulsive handgun purchases and that this reduction in turn leads to less impulsive handgun crime, beyond what California's ten-day waiting period already provides. In the absence of evidence and with no common-sense relation, the Government has not met its burden of demonstrating that § 26820 directly and materially advances that interest. In sum, the Government fails to show that § 26820 has any effect on handgun suicide or crime.
D. Whether § 26820 Is More Extensive Than Necessary
Finally, the last prong of the Central Hudson test requires the Government to demonstrate that the challenged statute "is no more extensive than necessary to further" the Government's interests.
*1018 Cent. Hudson , 447 U.S. at 569-70, 100 S.Ct. 2343. "The fourth part of the test complements the direct-advancement inquiry of the third, asking whether the speech restriction is not more extensive than necessary to serve the interests that support it." Greater New Orleans Broad. , 527 U.S. at 188, 119 S.Ct. 1923. In other words, "it should not be overinclusive." Valle Del Sol , 709 F.3d at 825 (emphasis omitted). The Government's fit need not be the least restrictive means, and it need not be perfect, but it must be reasonable. Greater New Orleans Broad. , 527 U.S. at 188, 119 S.Ct. 1923.
However, "[i]f the First Amendment means anything, it means that regulating speech must be a last-not first-resort." Thompson , 535 U.S. at 373, 122 S.Ct. 1497. "[I]f the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so." Id. at 371, 122 S.Ct. 1497. A statute is more extensive than necessary if the government has other options that could advance its asserted interest in a manner less intrusive on First Amendment rights. Rubin , 514 U.S. at 491, 115 S.Ct. 1585. The Government can achieve its interests not only through the creation of new laws, but also through the enforcement of existing laws. See Italian Colors Rest. v. Becerra , 878 F.3d 1165, 1178 (9th Cir. 2018) (holding California had "other, more narrowly tailored means of preventing consumer deception" such as banning deceptive or misleading surcharges, requiring retailers to disclose their surcharges both before and at the point of sale, or enforcing its existing laws banning unfair business practices and misleading advertising in pricing"); Valle Del Sol , 709 F.3d at 826-27 (holding Arizona could further its interest in traffic safety by enforcing existing traffic regulations rather than restricting speech).
The Government argues that § 26820 targets no more speech than necessary to further its asserted interests. (ECF No. 52 at 24.) However, the Government has "various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech." Valle Del Sol , 709 F.3d at 826 (quoting Comite de Jornaleros de Redondo Beach v. City of Redondo Beach , 657 F.3d 936, 949 (9th Cir. 2011) ). For example, California has several laws that, if enforced, further its substantial interest in reducing handgun suicide and crime without restricting speech. The most notable of these laws imposes a ten-day waiting period before a purchaser can receive a gun. Cal. Penal Code §§ 26815(a), 27540(a). This law, unlike § 26820, is precisely related to the Government's interests in preventing handgun suicide and violence as it "provides time not only for background checks, but for the purchaser to reflect on what he or she is doing, and, perhaps, for second thoughts that might prevent gun violence." Silvester v. Harris , 843 F.3d 816, 829 (9th Cir. 2016). Additionally, California limits purchasers to one handgun purchase within a thirty-day period, § 27535, and requires the purchaser complete a firearm safety certificate program, §§ 31610-31670. Unlike § 26820, which purportedly serves only to deter the impulsive purchase of a handgun (ECF No. 58 at 11), these laws act directly to deter the potential harmful consequences of handgun purchases without restricting speech. They allow purchasers not only the time to reflect on their purchases, but also provide an opportunity for purchasers to learn about gun safety. Further, to deter handgun crime, the Government has an arsenal of criminal laws it may enforce. Thus, the Government could further its asserted interests simply by enforcing these existing laws.
If the Government considers its existing safeguards inadequate to combat handgun *1019 suicide and crime, it may pass additional direct regulations within constitutionally permissible boundaries. The Government may also counteract what it views as dangerous messages with "more speech, not enforced silence." Lorillard Tobacco , 533 U.S. at 586, 121 S.Ct. 2404 (quoting Whitney v. California , 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring) ). For example, the Government could run an educational campaign focused on the dangers of handguns or the consequences of impulsive decision making. Although it appears the Government has rejected this idea, it has not demonstrated why this alternative would not be more effective than § 26820. Indeed, the Supreme Court has recognized that "educational campaigns focused on the problems [at issue] might prove to be more effective" than advertising regulations designed to decrease demand of a product. 44 Liquormart , 517 U.S. at 507, 116 S.Ct. 1495 (plurality opinion). As the Government has provided no evidence directly linking § 26820 to reduced handgun suicide or crime, it is surprising the Government is so quick to dismiss other viable alternatives that may have greater impact. The Government has restricted disfavored speech without acknowledging the efficacy of policy choices that do not burden speech. Accordingly, § 26820 is more extensive than necessary.
The Government has an array of policies at its disposal to combat handgun suicide and crime. "But the enshrinement of constitutional rights necessarily takes certain policy choices off the table." Heller , 554 U.S. at 636, 128 S.Ct. 2783. California may not accomplish its goals by violating the First Amendment. The Government fails to satisfy the third and fourth prongs of the Central Hudson test. Accordingly, § 26820 is unconstitutional on its face.
IV. CONCLUSION
For the foregoing reasons, the Court hereby GRANTS Plaintiffs' Motion for Summary Judgment, (ECF No. 51), and DENIES Defendants' Motion for Summary Judgment, (ECF No. 52). Further, the Court hereby orders that Defendants, and all persons and entities acting on their behalf, are enjoined from enforcing California Penal Code § 26820.
IT IS SO ORDERED.

The Government may not restrict commercial speech to shield a segment of the population when there are less restrictive alternatives. See Lorillard Tobacco , 533 U.S. at 581, 121 S.Ct. 2404 ("[T]he governmental interest in protecting children from harmful materials does not justify an unnecessarily broad suppression of speech addressed to adults.").

Of course, this is not to say handgun signs visible from the outside of a store do not serve an important interest to stores. It is possible these signs could channel a handgun purchaser into one store rather than another. See Greater New Orleans Broad. , 527 U.S. at 188-89, 119 S.Ct. 1923 ("While it is no doubt fair to assume that more advertising would have some impact on overall demand for gambling, it is also reasonable to assume that much of that advertising would merely channel gamblers to one casino rather than another.").