**NATIONAL COUNCIL FOR IMPROVED HEALTH, Stanley Malstrom, and Clive J. Buchanan, Plaintiffs,**

v.

**Donna SHALALA, U.S. Department of Health and Human Services, and David Kessler, U.S. Food and Drug Administration, Defendants.**

Civ. No. 94–C–509G.

United States District Court,
D. Utah,
Central Division.

June 30, 1995.

M. Richard Walker, M. Richard Walker & Associates, P.C., Salt Lake City, UT, Kirkpatrick W. Dilling, Dilling and Dilling, Chicago, IL, for plaintiffs.

Stephen J. Sorenson, Asst. U.S. Atty., Salt Lake City, UT, Susan L. Strawn (argued), Douglas Ross, Office of Consumer Lit., U.S. Dept. of Justice, Washington, DC, Louisa T. Nickerson, Assoc. Chief Counsel for Foods, Food and Drug Admin., Rockville, MD, for defendants.

## MEMORANDUM DECISION AND ORDER

J. THOMAS GREENE, District Judge.

This matter came before the Court on defendants' motion to dismiss plaintiffs' Second Amended Complaint. Kirkpatrick W. Dilling and M. Richard Walker appeared for the plaintiffs; Steven J. Sorenson and Susan Strahm represented the defendants. The parties filed extensive memoranda and supporting materials, after which the Court

heard oral argument and took the matter under advisement. Now being fully advised, the Court renders its Memorandum Decision and Order.

## FACTUAL BACKGROUND

Plaintiffs are manufacturers, distributors and consumers of dietary supplements. Plaintiff National Council for Improved Health ("NCIH") is a non-profit organization whose members include consumers, health care and scientific professionals, dietary supplement manufacturing and distributing firms, and independent business people who purchase, sell, and distribute dietary supplements. Plaintiff Stanley Malstrom is engaged in the marketing and distribution of dietary supplements. Plaintiff Clive Buchanan is a long-time consumer of dietary supplements. Plaintiffs seek declaratory and injunctive relief, claiming that regulations promulgated under the Federal Food, Drug, and Cosmetic Act ("FFDCA") pertaining to various dietary supplements are being implemented in excess of statutory authority. Plaintiffs also claim infringement of their constitutional rights.

## STATUTES AND REGULATIONS

In 1990, Congress passed the Nutrition Labeling and Education Act ("NLEA"),[1] for the purpose of clarifying and strengthening "the Food and Drug Administration's legal authority to require nutrition labeling on foods, and to establish the circumstances under which claims may be made about nutrients in foods."[2] The NLEA amended the Federal Food, Drug, and Cosmetic Act[3] in three principal ways relevant to these proceedings: *first*, placement of limitations upon claims which may be made in the labeling of foods and dietary supplements relative to the "relationship of any nutrient . . . to a disease

or a health-related condition" ("health claims"); *second* requiring disclosure of nutrition amounts in the labeling of foods and dietary supplements ("nutrition labeling"); and *third*, standardization of claims which "characterize the level of any nutrient" in foods or dietary supplements ("nutrient content"). Pursuant to its authority under the NLEA, FDA published proposed regulations to implement the NLEA with respect to foods in conventional form and dietary supplements on November 27, 1991.

In October 1992, prior to FDA publication of final regulations, Congress passed the Dietary Supplement Act of 1992 ("DS Act").[4] The DS Act imposed a moratorium on implementation of the NLEA with regard to dietary supplements until December 15, 1993. Under the DS Act, FDA was to issue proposed regulations pertaining to dietary supplements by June 15, 1993, and final regulations based on those proposals by December 31, 1993.

On June 18, 1993, FDA issued an Advance Notice of Proposed Rulemaking, which outlined the need for more regulation of dietary supplements, and called for public comment.[5] On that date, FDA also published new proposed regulations governing dietary supplements in the Federal Register, in which FDA proposed to make claims as to nutrient amounts, content levels, and disease or health-related conditions on dietary supplements including vitamins and minerals, as well as herbs and other similar nutritional substances, subject to requirements essentially the same as those which applied to foods in conventional form.[6] The regulations governing health claims were to take effect on July 5, 1994. The regulations governing nutrient content claims and nutrition labeling were to take effect July 5, 1995. In January

**1.** Pub.L. No. 101–535, 104 Stat. 2353 (1990); *see also* H.R.Rep. No. 538, 101st Cong., 2d Sess. 7, *reprinted in* 1990 U.S.C.C.A.N. 3336, 3337 (hereinafter House Report).

**2.** House Report, *supra* note 1, at 7.

**3.** 21 U.S.C. §§ 301–394.

**4.** Pub.L. No. 102–571, Title II, 106 Stat. 4491, 4500 (1992).

**5.** Advance Notice of Proposed Rulemaking, 58 Fed.Reg. 33690 (1993).

**6.** *See* 58 Fed.Reg. 33700 (1993) (proposed health claims regulations); *id.* at 33715 (proposed nutrition labeling regulations); *id.* at 33731 (proposed nutrient content claim regulations).

1994, FDA published final versions of those regulations.[7]

Then, in October 1994, Congress enacted the Dietary Supplement Health and Education Act of 1994 ("DSHE Act")[8] to further amend the Food, Drug and Cosmetic Act. The DSHE Act made certain findings of fact related to the health status of United States citizens and how proper diet can improve the health of the American consumer, and specifically found that a rational federal regulatory framework was needed to supersede the current regulatory approach to dietary supplements. Additionally, the Act revised the scope of the health claims regulations by exempting certain publications or writings from the purview of the regulations. The DSHE Act also declared the FDA's Advance Notice of Proposed Rulemaking of June 18, 1993, to be "null and void and of no force or effect" as it pertained to dietary supplements. Finally, the Act declared new standards for nutrition labeling and nutrient content claims for dietary supplements, and provided that dietary supplements must be labeled in accordance with its requirements after December 31, 1996. The Act did not invalidate the regulations promulgated by the FDA pursuant to the NLEA and the DS Act. However, FDA has indicated that it will review the nutrient content claims and nutrition labeling regulations to determine to what extent they need to be amended or revised before the new effective date, December 31, 1996. FDA has also indicated its intent to forego enforcement of the current nutrient content claim and nutrition labeling regulations until after December 31, 1996.[9]

**ANALYSIS**

Plaintiffs claim in Count I of the Second Amended Complaint that the regulations enacted by FDA pertaining to health claims are in violation of the plaintiffs' First Amendment rights of free speech. In Count II, plaintiffs claim that FDA has sought to establish maximum limits on the potency of any synthetic or natural vitamin or mineral, in violation of the clear will of Congress. Finally, in Count III, plaintiffs claim that FDA's regulations requiring nutrition labeling and restricting nutrient content claims for dietary supplements violate the Administrative Procedure Act ("APA"), and deny them the right of free access to dietary supplements without due process of law. Plaintiffs seek a declaration that the regulations are null and void, and injunctive relief against all persons from interfering with plaintiffs' access to dietary supplements.

Defendants have moved this Court to dismiss the complaint on jurisdictional grounds and on the merits. Defendants claim that this Court does not have subject matter jurisdiction because plaintiffs have no standing to challenge the regulations. On the merits, defendants claim that plaintiffs have failed to state a claim upon which relief may be granted in each of the three counts.

**I. HEALTH CLAIMS REGULATIONS**

Plaintiffs assert in Count I that the health claims regulations constitute prior restraints sufficient to bar truthful and not misleading commercial speech, in violation of their First Amendment rights of free speech. The health claims regulations address any claims made on the label or in the labeling of food or dietary supplements which characterize the relationship between any nutrient and a disease or health-related condition. The regulations require a finding of "significant scientific agreement" about a nutrient-disease relationship before it can be the subject of a health claim in the labeling of a dietary supplement.[10]

Plaintiffs have not sought or been refused authorization to make such health claims, but rather bring a facial challenge to the regulations. Defendants argue that the plaintiffs lack standing to bring such a challenge.

---

**7.** See 59 Fed.Reg. 395 (final health claims regulations); *id.* at 378 (final nutrient content claims regulations); *id.* at 354 (final nutrition labeling regulations).

**8.** Pub.L. No. 103–417, 108 Stat. 4325 (1994).

**9.** FDA Notice of Intent, 60 Fed.Reg. 7711 (1995).

**10.** See 21 C.F.R. § 101.14 (general requirements for health claims); *id.* § 101.70 (procedures for petitions for health claims).

## A. Standing to Challenge the Regulations

■ Article III, Section 2 of the United States Constitution confines the federal courts to adjudicating actual "cases or controversies." One of the elements of the case or controversy requirement is that the plaintiff has standing to bring the suit. Generally, a plaintiff must establish three elements to prove standing, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *first,* that he or she has suffered an actual or threatened injury in fact; *second,* the existence of a "causal connection" between the injury and the conduct complained of;[11] and *third,* that "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* (quoting *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 43, 96 S.Ct. 1917, 1924, 1926, 48 L.Ed.2d 450 (1976)).

■ Under this three-prong test, plaintiffs attempting to bring facial challenges to statutes or regulations are faced with the difficult burden of showing damage or injury. The Supreme Court has stated that "the challenger must establish that no set of circumstances exists under which the [act] would be valid. The fact that the [act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid...." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). As such, it is generally difficult to mount a successful facial challenge to a legislative act or regulations.

However, the Supreme Court has relaxed standing requirements with respect to facial challenges concerning First Amendment claims. In *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992), the Court stated:

"It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation.... This exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court."

*Id.* at 129, 112 S.Ct. at 2400–01 (1992); *see also Alexander v. United States,* —— U.S. ——, ——, 113 S.Ct. 2766, 2774, 125 L.Ed.2d 441 (1993) ("The 'overbreadth' doctrine, which is a departure from traditional rules of standing, permits a defendant to make a facial challenge to an overly broad statute restricting speech.").

The Tenth Circuit has similarly recognized this expanded notion of standing in the area of freedom of expression. In *O'Connor v. City and County of Denver,* 894 F.2d 1210 (10th Cir.1990), the Tenth Circuit held:

Within the First Amendment context, courts properly apply an expanded notion of standing to determine who may institute the asserted claim for relief.... Parties "who have not actually engaged in protected activity are allowed to challenge a statute that inhibits others from engaging in protected speech or expression."

*Id.* at 1214 (quoting *ACORN v. City of Tulsa,* 835 F.2d 735, 738 (10th Cir.1987)).

■ In this case, the plaintiffs' facial challenge of the health claims regulations implicates the First Amendment. Additionally, as was the case in *Forsyth,* every application of the challenged regulations could impermissibly suppress protected speech. Therefore, in light of the expanded notion of standing under the "overbreadth doctrine," this Court determines that plaintiffs have standing to challenge the health claims regulations.

## B. Constitutionality of the Regulations

■ Plaintiffs assert that the health claims regulations constitute prior restraints sufficient to bar truthful and not misleading commercial speech. In this regard, plaintiffs rely on the general principle that the First Amendment protects commercial speech from unwarranted governmental regulation. *See Central Hudson Gas & Electric Corp. v.*

---

11. There must be a showing that "the injury [is] fairly ... trace[able] to the challenged action of the defendant and not ... th[e] result [of] the independent action of some third party not be-fore the court." *Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136 (quoting *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976)).

*Public Service Commission,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2348–49, 65 L.Ed.2d 341 (1980); *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, 96 S.Ct. 1817, 1825–26, 48 L.Ed.2d 346 (1976).

In *Central Hudson,* the Supreme Court declared that commercial speech or expression "not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Central Hudson,* 447 U.S. at 561–62, 100 S.Ct. at 2348–49. The Court then noted that the Constitution accords "a lesser protection to commercial speech than to other constitutionally guaranteed expression," and set forth the following four-part analysis for determining the balance of protection to be accorded to such speech against the governmental interest in regulating commercial speech:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it must at least (1) *concern lawful activity and not be misleading.* Next, we ask (2) *whether the asserted governmental interest is substantial.* If both inquiries yield positive answers, we must determine (3) *whether the regulation directly advances the governmental interest asserted,* and (4) *whether it is not more extensive than is necessary to serve that interest.*

*Id.* at 566, 100 S.Ct. at 2351 (emphasis and numbers added); *see also Adolph Coors Co. v. Brady,* 944 F.2d 1543 (10th Cir.1991) ("*Coors I* ") (applying four-part *Central Hudson* test to regulations prohibiting disclosure of alcohol content information in advertising or labeling of malt liquor), *appeal sub nom. after remand, Adolph Coors Co. v. Bentsen,* 2 F.3d 355 (10th Cir.1993) ("*Coors II* "), *aff'd sub nom., Rubin v. Coors Brewing Co.,* —— U.S. ——, 115 S.Ct. 1585, 131 L.Ed.2d 532

(1995) (*See* discussion of *Coors II, infra* ). The Court will discuss the four part *Central Hudson* requirements as applied to the health regulations in this case.

**A. Lawful Activity—Not Misleading**

The first prong of the *Central Hudson* test is whether the speech governed by the regulations concerns a lawful activity and is not misleading. Manifestly, the labeling of foods or dietary supplements relates to an activity lawful under federal law. Moreover, because the regulations are designed to ensure the truthfulness of the health claims made through a requirement of scientific expert agreement as to their validity,[12] only statements as to which there is broad scientific consensus will be permitted. By their nature, such statements are not misleading. It follows that restrictions on health claims made on the label or in labeling of foods or dietary supplements govern speech which concerns lawful activity and is not misleading.

**B. Governmental Interest in the Regulations**

Under the second prong of *Central Hudson,* this Court must assess the strength of the government's interest in regulating the types of health claims made in relation to foods and dietary supplements. With respect to this prong of the test, plaintiffs claim that the government has failed to establish that it has any substantial interest that would justify such legislation or regulations. In response, the government points to the legislative history of the NLEA and to three main governmental interests which are identified therein: prevention of consumer fraud; improving the public health; and ensuring that claims indicating a relationship between a nutrient and a disease be based on sound scientific agreement.[13]

---

**12.** The standard for approval of health claims is as follows:

> FDA will promulgate regulations authorizing a health claim only when it determines, based on the totality of publicly available scientific evidence ... that there is significant scientific agreement among experts qualified by scientific training and experience to evaluate such

claims, that the claim is supported by such evidence.

21 C.F.R. § 101.14(c) (1994).

**13.** Health claims were not permitted on foods until the 1980s. But when the FDA relaxed enforcement of regulations during the early years of the Reagan administration, it lost control of

This Court finds that the government has asserted a substantial interest in ascertaining the validity and truthfulness of health-related claims on the labels or in labeling of foods and dietary supplements.

## C. Direct Advancement of the Governmental Interest

Under the third inquiry in *Central Hudson,* this Court must determine whether the regulations at issue directly advance the governmental interest asserted. In this regard, the Supreme Court, in *Edenfield v. Fane,* —— U.S. ——, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993), stated:

> the government carries the burden of proving the direct and material advancement of its interest.... [This burden] is not satisfied by mere speculation and conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree."

*Id.* at ——, 113 S.Ct. at 1800.

The legislative history of the NLEA recounts that during the 1980s, as scientific studies identified and clarified the relationship between diet and good health, the potential for consumer fraud through false health claims increased. This in large part established and supported Congress' belief that regulation of health claims, as in the labeling of foods and dietary supplements, would be

effective to combat consumer fraud, and at the same time would assist the consumer in making informed decisions about diet.

The Supreme Court has held that when a legislative body determines that particular legislation will directly advance a substantial interest, courts reviewing the legislation which find that the legislators' determination is reasonable are justified in upholding it. *See Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 509, 101 S.Ct. 2882, 2893, 69 L.Ed.2d 800 (1981) (plurality opinion).[14]

The regulations promulgated under the NLEA provide that any claim that relates a particular nutrient to a particular disease or health condition must be supported by scientific agreement. As such, the regulations directly advance the government's interest in preventing the perpetration of fraud on the consumer by spurious or unsupported health claims. Manifestly, Congress' determination that there should be regulation of health claims in connection with the labeling of foods and dietary supplements meets the requirement of reasonableness. Accordingly, this Court determines that the government has met its burden of showing that the regulations directly and materially advance its interests in preventing consumer fraud and improving the public health.

## D. Extent and Scope of the Regulations

The final factor to consider under *Central Hudson* is whether the challenged regula-

---

the marketplace, and *many unfounded claims began being used [in] foods.*

\* \* \* \* \* \*

Whatever approach the agency takes, it must adopt a system that evaluates the validity of any disease claims made with respect to these substances. *Its system must be based on considerations of public health and consumer fraud.*

\* \* \* \* \* \*

There is a great potential for defrauding consumers if food is sold that contains inaccurate or unsupportable health claims. The potential is just as great for [dietary supplements] as it is for other products. In our view, vitamins and the other substances covered by this provision should be subject to at least as strong a standard as is applicable to other foods that contain claims that the food will treat a disease or health condition.

136 Cong.Rec. H12951–02, 12953 (statement of Rep. Waxman) (emphasis added).

**14.** In *Metromedia,* in upholding reasonableness of legislators' determination that billboard advertising affects traffic safety, the Supreme Court stated: "[w]e likewise hesitate to disagree with the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety." Likewise, in *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 342, 106 S.Ct. 2968, 2977, 92 L.Ed.2d 266 (1986), the Supreme Court upheld legislators' determination that advertising of casino gambling would increase demand for gambling, stating "[w]e think the legislature's belief is a reasonable one."

tions are more extensive than is necessary to serve the asserted governmental interest. In this regard, the Supreme Court stated in *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989):

> In requiring [regulation of expressive conduct] to be 'narrowly tailored' to serve an important or substantial state interest, we have not insisted that there be no conceivable alternative, but only that the regulation not "burden substantially more speech than is necessary to further the government's legitimate interests."

*Id.* at 478, 109 S.Ct. at 3033–34 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989)).

In this case, the FDA's objective is to protect consumers' health and well being by preventing the dissemination of unsupported or insubstantial scientific information on food and dietary supplement labeling. The regulations are restrictive in that they apply only to "health claims" made "on the label or in labeling" of a food or dietary supplement.[15] Indeed, Congress subsequently narrowed the definition of labeling with respect to dietary supplements.[16] The effect was to narrow the regulation on commercial speech to *only* those things directly attached to the product on the label or in labeling of the dietary supplements. As such, the statutes and regulations are no broader than necessary to prevent the perpetration of consumer fraud by unsubstantiated health claims on or accompanying the products.[17]

 Reasonable time requirements are imposed in connection with processing petitions for approval of health claims concerning

---

15. "Health claim" is a term defined in the regulations as a claim which "characterizes the relationship of any substance to a disease or health related condition." 21 C.F.R. § 101.14(a)(1). "Label" is defined in the statute as "a display of *written, printed or graphic matter upon the immediate* container of any article," 21 U.S.C. § 321(k), and "labeling" is defined as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." *Id.* § 321(m).

 With regard to the "accompanying such article" language, the Supreme Court, in *Kordel v. United States*, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52 (1948), stated:

> "One article or thing is accompanied by another when it supplements or explains it, in the manner that a committee report of the Congress accompanies a bill. No physical attachment one to the other is necessary. It is the textual relationship that is significant."

*Id.* at 350, 69 S.Ct. at 109–10 (upholding conviction of defendant for violating Federal Food, Drug and Cosmetic Act by misstatements in pamphlet literature accompanying drug products).

16. In the DSHE Act, enacted in October 1994, Congress exempted from the labeling requirements

> [a] publication, including an article, a chapter in a book, or an official abstract of a peer-reviewed scientific publication that appears in an article and was prepared by the author or the editors of the publication, which is reprinted in its entirety,

so long as such publication
(1) is not false or misleading;
(2) does not promote a particular manufacturer or brand of a dietary supplement;
(3) is displayed or presented, or is displayed or presented with other such items on the same subject matter, so as to present a balanced view of the available scientific information on a dietary supplement;
(4) if displayed in an establishment, is physically separate from the dietary supplements; and
(5) does not have appended to it any information by sticker or any other method.
21 U.S.C. § 343–2(a). Additionally, § 343–2 states that subsection (a) does not restrict a retailer or wholesaler of dietary supplements in any way in the sale of books or other publications. *Id.* § 343–2(b).

17. The regulations do not impose an outright ban, but rather impose a means for ensuring the truthfulness of the claims. Indeed, the regulations provide the process whereby a manufacturer or distributor of dietary supplements who wishes to make a health claim may petition for approval to do so in the same way as applies to foods in conventional form. The regulations state that any petition so approved will be promulgated as a regulation setting forth the approved health claim for use by other manufacturers or distributors, and provide a time frame within which such may be accomplished.

 The requirements for making health claims with respect to dietary supplements are the same as those for making health claims about foods in conventional form, as are the procedures for approval of new claims. The regulations do not have a discriminatory impact on manufacturers or distributors of dietary supplements. *See* 21 C.F.R. § 101.14.

dietary supplements. In this regard, the regulations specify time frames which require FDA to deny a petition for such approval or promulgate a proposed regulation for public comment within a total of 205 days from receipt of the initial petition.[18]

In *Rubin v. Coors Brewing Co.,* ⸺ U.S. ⸺, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995), the Supreme Court, even while considering other, less-restrictive means to accomplish the government's stated interests, did not change its interpretation of the fourth *Central Hudson* factor as explained in *Fox:* that is, it is only required that a "reasonable fit" be achieved between the end sought and the means used.[19] The *Rubin* case was decided after this case at bar was taken under advisement, but it does not alter the result reached herein.[20] It is therefore apparent to this Court that *Fox* and the cases upon which the Supreme Court relied in *Fox* still govern the application of the fourth prong of the *Central Hudson* test.

This Court finds that there exists a reasonable fit between the end sought, the protection of consumers from unsupported or unsubstantiated health claims, and the means used, the regulations promulgated by the FDA. Therefore, this Court rules that the regulations governing health claims pass constitutional muster under all four prongs of the *Central Hudson* test, and that the regulations do not impermissibly infringe on commercial speech in violation of the First Amendment. It follows that Count I of the Second Amended Complaint should be dismissed.

## II. MAXIMUM POTENCY LIMITS

In Count II of the Second Amended Complaint, the plaintiffs allege that the FDA is attempting to decree nutrient limits for various ingredients of dietary supplements.

18. *See* 21 C.F.R. § 101.70(j).

19. *Fox,* 492 U.S. at 478, 109 S.Ct. at 3033–34. The Supreme Court went on to say in *Fox* that:
In sum, while we have insisted that " 'the free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing ... the harmless from the harmful,' " we have not gone so far as to impose upon them the burden of demonstrating that the distinguishment is 100% complete, or that the manner of restriction is absolutely the least severe that will achieve the desired end. What our decisions require is a " 'fit' between the legislature's ends and the means chosen to accomplish those ends,"—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is "in proportion to the interest served;" that employs not necessarily the least restrictive means but, as we have put it in other contexts discussed above, a means narrowly tailored to achieve the desired objective. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed.
*Id.* (quoting *Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 478, 108 S.Ct. 1916, 1924, 100 L.Ed.2d 475 (1988) (quoting *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626, 646, 105 S.Ct. 2265, 2279, 85 L.Ed.2d 652 (1985)); *Posadas de Puerto Rico Associates v. Tourism Company of Puerto Rico,* 478 U.S. 328, 341, 106 S.Ct. 2968, 2976–77, 92 L.Ed.2d 266 (1986); *In re R.M.J.,* 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982)).

20. *Rubin* involved a prohibition of listing the alcohol content on beer labels, even though disclosure of the alcohol content in beer was not prohibited in advertising, and notwithstanding a requirement that such disclosures be listed on wine and other alcohol containers. The Supreme Court, in applying the *Central Hudson* test, found that statements of alcohol content constituted commercial speech, and also that the government's interest in curbing "strength wars" was substantial. However, the Court found that the provisions did not advance the government's interest in a direct and material way, relying in part on *Edenfield v. Fane,* ⸺ U.S. ⸺, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993), in which case the Supreme Court elaborated on the requirements for direct and material advancement of the government's interest.

*Rubin* is distinguishable from the case at bar. In *Rubin,* the provisions at issue prevented the disclosure of true and correct information with regard to one product, while the overall regulatory framework permitted or required such information on other similar products. Additionally, as the Court noted, the provisions in *Rubin* flew in the face of a trend toward the free flow of truthful and not misleading information. In the instant case, the health claims regulations do not ban truthful, supported claims. Rather, such claims are permitted, and a procedure for receiving approval for such claims is clearly laid out in the regulations. The health claims regulations are consistent with the NLEA and its stated purpose of establishing the circumstances under which claims may be made about nutrients in foods, in order to prevent consumer fraud.

Plaintiffs request that this Court enter a declaratory judgment that FDA may not establish maximum potency limits pertaining to any natural or synthetic vitamin, mineral, or other nutritional factor, and seek to enjoin the defendants from interfering with potency limits of such nutrients. However, nowhere in their Second Amended Complaint or supporting papers do the plaintiffs indicate how or where the FDA is attempting to establish potency limits on these nutrients.

 Section 350 of Title 21 of the United States Code provides:

(1) Except as provided in paragraph (2)—

(A) the Secretary may not establish, under section 321(n), 341, or 343 of this title, maximum limits on the potency of any synthetic or natural vitamin or mineral within a food to which this section applies

. . . . .

(2) Paragraph (1) shall not apply in the case of a vitamin, mineral, or other ingredient of food, or food, which is represented for use by individuals in the treatment or management of specific diseases or disorders, by children, or by pregnant or lactating women.

21 U.S.C. § 350(a)(1)–(2). This provision of law effectively prohibits establishment of such potency limits.

 This Court has been unable to find any regulations which purport to establish potency limits for vitamins, minerals, dietary supplements, or other nutrients in violation of the aforesaid statute. Since plaintiffs have failed to show how the FDA is attempting to violate this section, the burden of establishing a prima facie case as to Count II has not been borne. Accordingly, Count II of the Second Amended Complaint is dismissed without prejudice for failure to state a claim upon which relief can be granted.

### III. NUTRITION LABELING AND NUTRIENT CONTENT CLAIMS

 In Count III of the Second Amended Complaint, plaintiffs allege that the regulations which require nutrition labeling and restrict nutrient content claims for dietary supplements violate the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 500 et seq. Specifically, plaintiffs allege that the regulations are "arbitrary, capricious, and an abuse of the power prescribed by Congress, and beyond the legal authority of the FDA Commissioner and the Secretary of Health and Human Services." Second Amended Complaint at 18–19. Plaintiffs complain that the regulations have and will interfere with the medical practices, business, and consumer rights of the plaintiffs. Plaintiffs also contend that the regulations violate the legal and Constitutional rights of manufacturers, distributors and consumers of dietary supplements, specifically the Fifth Amendment right of due process of law, and their "Constitutional rights of privacy." Id. at 21.

As noted above, in October 1994 Congress enacted the Dietary Supplement Health and Education Act which declared the FDA's Advance Notice of Proposed Rulemaking dealing with nutrient content claims and nutrition labeling null and void. The FDA, in response, published a Notice of Intent in the Federal Register,[21] announcing that given FDA's need to modify the regulations on nutrition labeling and nutrient content claims for dietary supplements, the FDA does not intend to enforce those regulations until after December 31, 1996. The FDA noted that the DSHE Act is silent as to its applicability to the effective date of July 5, 1995, of the promulgated regulations. However, the FDA found that it would be unfair to require dietary supplement manufacturers and distributors to label their products one way by July 1995, and possibly a different way after December 31, 1996. Accordingly, FDA made it clear that it will not enforce the presently promulgated regulations which address nutrient content claims and nutrition labeling. FDA also indicated its intent to modify the regulations as necessary to comport with the terms of the DSHE Act.[22]

Because the FDA has indicated its intent to modify the particular regulations challenged by the plaintiffs, and to eschew en-

---

**21.** 60 F.R. 7711 (1995).

**22.** FDA Notice of Intent, 60 Fed.Reg. 7711 (1995). That Notice provides: "FDA advises that, while the nutrition labeling and nutrient content claim regulations implementing the 1990 amendments for dietary supplements will go into effect on July 1, 1995, it does not intend to enforce those regulations until it has modified

forcement of those regulations until it has been able to modify them to conform with the DSHE Act, this Court finds that plaintiffs' claims with respect to these regulations are not ripe for review at this time. As such, this Court need not address the merits of the regulations, and finds that Count III of plaintiffs' Second Amended Complaint should be dismissed without prejudice.

Based on the foregoing, it is hereby

**ORDERED,** that the defendants' motion to dismiss Count I of the Second Amended Complaint is **GRANTED,** and that Count is **DISMISSED;** it is further

**ORDERED,** that the defendants' motion to dismiss Count II of the Second Amended Complaint is **GRANTED,** and that Count is **DISMISSED** without prejudice; it is further

**ORDERED,** that the defendants' motion to dismiss Count III of the Second Amended Complaint is **GRANTED,** and that Count is dismissed without prejudice.

Counsel for defendants are instructed to prepare and lodge with the Court a form of judgment consistent with this Memorandum Decision and Order, after first complying with District of Utah Rule of Practice 206.

them to reflect the 1994 DSHEA, and until after dietary supplement manufacturers are required to label their products in accordance with the 1994 DSHEA; that is, not until after December 31, 1996."