**KNOLL PHARMACEUTICAL COMPANY, Plaintiff,**

**v.**

**Len SHERMAN, in his capacity as Director of the Illinois Department of Professional Regulation; John Coghlan, in his capacity as Director of State Wide Enforcement of the Illinois Department of Professional Regulation, Defendants.**

**No. 99 C 3202.**

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 3, 1999.

Jeffrey S. Kinsler, Bettina Getz, Diane Julia Romza–Kutz, Nerissa A. McGinn, Mayer, Brown & Platt, Chicago, IL, for Knoll Pharmaceutical Company, plaintiff.

Thomas A. Ioppolo, Mary Therese Nagel, Illinois Attorney General's Office, Chicago, IL, for Illinois Department of Professional Regulation, Len Sherman, in his capacity as director of the Illinois Department of Professional Regulation, John Coghlan, in his capacity as Director of State Wide Enforcement of the Illinois Department of Professional Regulation, defendants.

## *DECISION ON THE MERITS*

CONLON, District Judge.

Merida is a prescription weight-loss drug classified as a controlled substance. Meridia is publicly advertised in nationally distributed magazines, newspapers, and on broadcast and cable television. Illinois officials have notified Meridia's manufacturer, Knoll Pharmaceutical Company ("Knoll"), of their intent to take enforcement action against Knoll under an Illinois law that bans advertising of controlled substances by name. Knoll challenges the constitutionality of the Illinois law on three separate grounds.

This court granted Knoll's motion for a temporary restraining order. By agreement, the restraining order continues in effect pending a decision on Knoll's request for a permanent injunction. An evidentiary hearing was held, oral arguments were conducted, and the issues are fully briefed. All material facts are undisputed. The court enters the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## *BACKGROUND*

### A. FOOD AND DRUG ADMINISTRATION APPROVAL

Knoll developed Meridia (sibutramine hydrochloride monohydrate) as a prescription weight loss agent to aid in the treatment of obesity. Meridia is an amphetamine analogue that stimulates the central nervous system. Before marketing Meridia, Knoll was required to obtain Food and Drug Administration ("FDA") approval establishing that the drug is safe and effective. 21 U.S.C. § 355. The exhaustive FDA approval process requires an applicant to submit: proposed labeling; statements of the drug's potential adverse effects and interactions with other drugs, arranged by gender, age, and racial subgroups; and full reports of multiple studies of the drug, its absorption rate, its effect on a developing fetus, and an integrated summary of all available information about its safety. 21 C.F.R. § 314.50. In order to assess potential risks, the FDA further requires a description and analysis of information relating to abuse or over dosage of the drug. 21 C.F.R. § 314.50(d)(5)(vii). Knoll complied with these procedures. In November 1997, the FDA found Meridia to be safe and effective for management of obesity, including weight loss and maintenance of weight loss, used in conjunction with a reduced calorie diet. The FDA also approved Meridia's draft labeling and required Knoll to submit its proposed promotional material and packaging for approval.

As part of the approval process, the FDA conducted an abuse liability assessment of sibutramine, Meridia's main component. As a result, the FDA recommended to the Drug Enforcement Administration ("DEA") that sibutramine be placed in Schedule IV of the Federal Controlled Substances Act. Knoll assented to the FDA's scheduling recommendation. DEA placed sibutramine in Schedule IV. 63 Federal Register 6862–6864 (February 11, 1998).[1] The standards for Schedule IV classification apply if:

> The drug ... has a low potential for abuse relative to the drugs ... in Schedule III; [the] drug ... has a currently accept[able] medical use in U.S.; [a]buse ... may lead to limited physical ... or psychological dependence relative to the drugs ... in Schedule III.

21 U.S.C. § 812. Meridia is classified with Schedule IV stimulants: drugs that have "a stimulant effect on the central nervous system." 21 C.F.R. § 1308.14(e).

Knoll then developed a national advertising campaign, subject to FDA review and approval. Federal law bars only advertising Schedule I controlled substances, which are unsafe drugs with a high potential for abuse and no currently accepted medical use; advertising Schedule IV controlled substances is not prohibited by federal law. 21 U.S.C. § 843(c). The FDA has responsibility for insuring that the advertising of prescription drugs is not false or misleading. 21 U.S.C. § 352(n). Specific requirements are set by the FDA for advertising prescription drugs: information on side effects, contraindications, warnings and precautions; the manner in which clinical data or safety and effectiveness claims may be cited; the layout and size of the drug name, ingredients, side effect information and dosage. 21 C.F.R. § 202.1. The FDA actively participated in the wording of Meridia advertisements.

All potential risk information—including the controlled nature of sibutramine—is clearly presented to consumers. The FDA approved Knoll's proposed nationwide print and broadcast consumer advertising.

## B. MERIDIA'S NATIONAL ADVERTISING CAMPAIGN

A massive advertising campaign was launched in October 1998. Knoll used a New York-based advertising company, Foote, Cone & Belding, to run the campaign nationally on television and in print. Meridia commercials have appeared on all major television network and cable programming. Pl.Ex. 3. Full page advertisements have appeared in nationally circulated newspapers, such as *The New York Times* Sunday edition, *The Wall Street Journal, The Chicago Tribune* and *The Los Angeles Times. E.g.,* Pl.Ex. 6. Prominent multiple-page advertisements have appeared in nationally marketed magazines, including *Family Circle, People,* and *Fitness.* Pl.Ex. 7.

Knoll also maintains a consumer website on the internet as part of its Meridia advertising program. Pl.Ex.10. The website is international in scope.

The uncontroverted evidence establishes there is no practicable way Illinois can be selectively blacked out of Meridia's national advertising. There are 200 television marketing areas in the United States configured by broadcast signals. State boundaries are irrelevant. Nielsen's designated market area map, commonly used in the advertising industry, shows there are ten separate markets that come into contact with the State of Illinois. Pl.Ex. 5. Illinois marketing areas cross state lines into Iowa, Missouri, Kentucky, Tennessee and Indiana. *Id.* Technologically, television commercials cannot be blacked out in Illinois marketing areas without blacking out marketing areas that extend into

---

**1.** Knoll has petitioned DEA for declassification of Meridia as a controlled substance. Contrary to Knoll's representations to the FDA three months ago [Pl.Ex.15], declassification apparently is a lengthy process. It is unlikely this case will be mooted by the possibility of a favorable DEA decision in the near future.

states adjacent to Illinois. Even if all ten marketing areas that include Illinois were blacked out, there is a 10 percent error rate in blackout effectiveness for scheduled programming and a 60 percent error rate for live programs like the *Today Show.* And Illinois viewers with satellite television could still pick up blacked out commercials from non-Illinois marketing areas. Moreover, there is no available technological means to only black out Illinois in the cable television market. It is impossible to prevent Illinois residents from accessing Knoll's Meridia website. Finally, there is no practicable way advertising can be run in a nationally distributed newspaper or magazine for 49 states, blacking out just Illinois. In sum, a ban on advertising Meridia in Illinois can be effective only if Meridia's national advertising campaign is terminated.

## C. PUBLIC HEALTH EVIDENCE

Knoll's assertions of Meridia's effectiveness in treating obesity, as well as the serious health problems associated with obesity, are unchallenged. In its petition to DEA for declassification of Meridia as a controlled substance, Knoll reports it has gathered substantial evidence ("chemical, preclinical, clinical, postmarketing") of sibutramine's lack of abuse potential. Pl. Ex. 16. More than 1.5 million prescriptions for Meridia were dispensed to 835,-000 patients by the end of March 1999. *Id.* According to Knoll's DEA submission,

> [M]ultifaceted initiatives monitoring known drug abuser populations, drug exposure outcomes, spontaneous adverse event reporting, drug abuse-related internet archives, and local sales and distribution, have yielded no reports indicating Meridia abuse. Similarly, Knoll is not aware that the FDA has received adverse event reports of chemical dependency associated with Meridia, nor is the company aware that the DEA has

received reports of illegal trafficking of the drug.

*Id.*

At the hearing in this case in late May 1999, uncontroverted and credible testimony by Dr. Steven Weinstein, Knoll's medical director, established that Knoll still has not received any indications from postmarketing monitoring initiatives that Meridia is the subject of abuse or illegal trafficking.

Defendants Len Sherman and John Coghlan, sued respectively in their official capacities as Director and Enforcement Director of the Illinois Department of Professional Regulation (collectively, "the State of Illinois" or "the state"),[2] have not submitted any evidence that Meridia has caused, or threatens to cause, a specific danger to the health or safety of Illinois residents. Rather, the State of Illinois relies on the generalized conclusion that advertising any controlled substance by name to the public poses a danger to the community because of potential misuse: Meridia "... *could* cause physical or psychological dependence, it *could* be marketed illegally, it *could* induce the kind of euphoric drug 'high' that leads people to use and overuse the drug for non-medical reasons." Def.Br. at 4 (emphasis added). In other words, the state's argument assumes advertising induces abuse. The state worries, "Today Meridia, tomorrow ... morphine ..."! *Id.* at 6. The state is concerned that patient pressure generated by Meridia advertising may cause physicians to unethically prescribe Meridia for addicts without medical justification. *Id.* at 6–7. The state fails to submit any empirical or anecdotal evidence to support its concerns.

## D. THE ILLINOIS CONTROLLED SUBSTANCE ACT

Section 315 of the Illinois Controlled Substance Act provides that, "[n]o controlled substance shall be advertised to the

**2.** The Illinois Department of Professional Regulation was dismissed as a defendant by stipulation of the parties. *See* Order of June 10, 1999.

public by name." 720 ILCS 570/315 (1998). The legislative intent of the Controlled Substance Act is codified [720 ILCS 570/100], so the court need not pursue the questionable task of reconstructing the Illinois General Assembly's intent. The Illinois General Assembly intended to provide a system that would stem the rising tide of drug abuse and would limit controlled substance access "only to those persons who have demonstrated an appropriate sense of responsibility and have a lawful and legitimate reason to possess [controlled substances]." *Id.* The Act intends to deter "unlawful and destructive abuse of controlled substances" and to "penalize most heavily the illicit traffickers or profiteers of controlled substances, who propagate and perpetuate the abuse of such substances with reckless disregard for its consumptive consequences upon every element of society." *Id.* Of particular significance here is the legislative acknowledgment of "the functional and consequential differences between the various types of controlled substances" and the corresponding need for "different degrees of control over each of the various types [of controlled substances]." *Id.*

Enforcement powers of the Illinois Department of Professional Regulation include suspension or revocation of Knoll's license to distribute pharmaceuticals in Illinois, [720 ILCS 570/304 (1998) ], or obtaining an injunction against the Meridia advertising campaign in an Illinois court. 225 ILCS 120/80 (1998). Despite the fact that the law has been in effect since 1971, this appears to be the first time the state has actually enforced the controlled substance advertising ban against a prescription drug.

## ANALYSIS

Knoll contends that enforcement of the Illinois controlled substance advertising ban against Meridia is unconstitutional on three separate grounds. The threatened action would violate the First Amendment's protection of commercial speech. U.S. Const. amend. I. Enforcement of the advertising ban would have the effect of regulating markets outside Illinois borders, thereby violating the Commerce Clause. U.S. Const. art. I, § 8. In addition, the threatened advertising ban is preempted by federal law under the Supremacy Clause. U.S. Const. art. VI. Knoll seeks declaratory and injunctive relief.[3]

This action arises under the Constitution of the United States. 28 U.S.C. § 1331. Accordingly, this court has jurisdiction.

## A. THE FIRST AMENDMENT AND COMMERCIAL SPEECH

Knoll contends that applying the Illinois controlled substance advertising ban against Meridia would violate the First Amendment's protection of commercial speech. The state does not dispute that Meridia's advertisements are commercial speech.

First Amendment protection of commercial speech is a fairly modern development in constitutional jurisprudence. The First Amendment itself does not make any distinction between forms of speech, political, religious, commercial, or otherwise. It has been suggested that in 1942, "the Supreme Court plucked the commercial speech doctrine out of thin air." Alex Kozinski & Stuart Banner, *Who's Afraid of Commercial Speech?*, 76 Va. L.Rev. 627 (1990). In an extraordinarily short and conclusory opinion, the Supreme Court held that a New York law prohibiting distribution of promotional handbills for tours of a retired Navy submarine did not violate the First Amendment because the free communication of information and opinions does not extend to "purely commercial advertising." *Valentine v. Chrestensen*, 316 U.S. 52, 54, 62 S.Ct. 920, 86 L.Ed. 1262 (1942). In finding that commercial speech was not

---

**3.** In its verified complaint, Knoll requests a jury trial. Compl. ¶ 38(f). However, Knoll has not identified any disputed issue of material fact for a jury's determination.

constitutionally protected, *Chrestensen* did not cite any authority nor did the Court engage in an analysis of constitutional history or theory. Thus began the judicial distinction between commercial and non-commercial speech, creating precedent for according commercial speech little or no constitutional protection.

The Supreme Court first held that commercial speech is subject to limited First Amendment protection in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). The State of Virginia effectively prohibited dissemination of prescription drug price information. In upholding the right of licensed pharmacists to advertise the prices of prescription drugs, the Court concluded that a state may not suppress dissemination of truthful information about a lawful activity simply because the state is fearful of the information's effect upon the public. 425 U.S. at 773, 96 S.Ct. 1817. The Court characterized Virginia's prohibition on price advertising as "highly paternalistic" and remarked that price information is not harmful in itself:

> [P]eople will perceive their own best interests if only they are well enough informed, and ... the best means to that end is to open the channels of communication rather than to close them.

*Id.* at 770, 96 S.Ct. 1817. Nevertheless, the Court noted that some forms of commercial speech may be regulated by the state, provided the restrictions serve a significant governmental interest. 425 U.S. at 771, 96 S.Ct. 1817. Without any constitutional analysis, the Court footnoted that a lower degree of constitutional protection is necessary with respect to commercial speech because of "commonsense differences." *Id.* at 771–72, n. 24, 96 S.Ct. 1817. The concept of limited First Amendment protection for commercial speech apparently originated with this footnote.

Several years later, the Supreme Court announced a judicial test for determining whether commercial speech is protectable against specific governmental restrictions. *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). If commercial speech concerns a lawful activity and is not misleading, the government may not regulate the speech unless: (1) the asserted governmental interest is substantial; (2) the regulation directly advances the asserted governmental interest; and (3) the regulation is no more extensive than necessary to further the governmental interest. 447 U.S. at 564, 100 S.Ct. 2343. Courts have subsequently applied the *Central Hudson* test to an endless variety of governmental regulations, producing *ad hoc* results. *E.g., Greater New Orleans Broadcasting Association, Inc. v. United States*, —— U.S. ——, —— — ——, 119 S.Ct. 1923, 1935–36, 144 L.Ed.2d 161 (1999) (Federal Communications Commission could not restrict truthful, non-misleading advertising by lawful private casino in Louisiana, where gambling is legal; FCC failed to overcome presumption "that the speaker and the audience, not the Government, should be left to assess the value of accurate and nonmisleading information about lawful conduct"); *Rubin v. Coors Brewing Company*, 514 U.S. 476, 486, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995) (federal law prohibiting beer labels from displaying alcohol content violated First Amendment; ban on publication of factual information regarding alcohol content did not directly advance substantial governmental interest in preventing beer "strength wars" and alcoholism); *Edenfield v. Fane*, 507 U.S. 761, 771, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) (Florida solicitation ban applicable to certified public accountants violated First Amendment; state failed to carry its burden of showing its substantial interest in maintaining standards of ethical conduct and public trust was directly and materially advanced by banning truthful, non-deceptive solicitations).

Applying the criteria developed by the Supreme Court over the past 20 years, the State of Illinois has not carried its burden. It is undisputed that Knoll is engaged in a lawful activity, manufacturing and distributing an FDA-approved prescription drug. The truthfulness and accuracy of Meridia advertising is conceded. And Knoll does not contest the state's obvious and substantial interest in suppressing drug abuse and illegal trafficking in controlled substances. Rather, the dispute centers on two related questions: whether the controlled substance advertising ban directly advances the state's interest in suppressing drug abuse and illegal drug trafficking and whether the advertising ban is more excessive than necessary to further that interest. *Central Hudson,* 447 U.S. at 564, 100 S.Ct. 2343.

The state justifies its blanket prohibition on possibilities and speculation. Simply because Meridia is classified as a Schedule IV controlled substance, the state argues that advertising Meridia by name may cause abuse, misuse or unethical conduct by prescribing physicians. Despite the worthy goals of the state's drug policy, truthful advertising about a lawful activity may not be suppressed based only on speculation concerning the effect that truthful information might have on the public. *Virginia State Board of Pharmacy,* 425 U.S. at 773, 96 S.Ct. 1817. Enforcement of the advertising ban against Meridia would be precisely the paternalistic suppression of information that the Supreme Court has pronounced unconstitutional. *Id.* at 770, 96 S.Ct. 1817; *Coors Brewing,* 514 U.S. at 484, 115 S.Ct. 1585. The state fails to show that its advertising ban would have a direct effect on drug abuse. The record is barren of any evidence there is real harm to the public actually associated with Meridia. Indeed, the record suggests just the opposite. Preventing the public from having free access to accurate information about Meridia, including potential harmful effects, does not bear a direct, rational relationship to the state's drug abuse policy. Accordingly, the advertising ban cannot pass constitutional muster when applied to Meridia. *Edenfield,* 507 U.S. at 770–71, 113 S.Ct. 1792.

In addition, the state's blanket ban on advertising all controlled substances reaches not only addictive illegal drugs with little or no medical value, but the law also includes FDA-approved prescription drugs with proven medical value. The blanket ban appears inconsistent with the Illinois General Assembly's codified legislative intent to take into consideration "the functional and consequential differences between various types of controlled substances" and the corresponding need for "different degrees of control over" different types of controlled substances. 730 ILCS 570/100. It is highly questionable whether the advertising ban deters illegal, dangerous drug trafficking because the prospect of drug dealers advertising illegal drugs or black market prescription drugs is absurd. Nor is there a rational connection between preventing drug abuse and banning the use of a drug's name, while permitting advertising that identifies the drug generically. Of course, it is commercially unrealistic to suggest that the advertising ban is narrowly drawn because it only forbids advertising of controlled substances by name. What incentive would a pharmaceutical manufacturer or distributor have to finance an expensive advertising campaign without identifying its prescription drug by name? Indeed, the ban on use of a name in advertising controlled substances is in effect a ban on commercial advertising of lawful prescription drugs. The ban has no demonstrable impact on drug addiction, illegal drug trafficking or unethical medical practice.

In sum, there is no evidentiary basis to conclude that the advertising ban advances the state's anti-abuse objectives in a material way. Thus, the ban may not be upheld because " . . . it provides only ineffective and remote support for the [state's] purpose." *Central Hudson,* 447 U.S. at 564, 100 S.Ct. 2343. And on its face, the

advertising ban is not narrowly tailored to serve the state's drug abuse purpose. This is an impermissible blanket ban that reaches truthful commercial speech about a lawful product. *44 Liquormart, Inc. v. Rhode Island* 517 U.S. 484, 507–08, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996).

## B. EXTRATERRITORIALITY AND THE COMMERCE CLAUSE

Knoll cannot comply with the Illinois advertising ban unless it cancels all advertising in nationally and regionally distributed newspapers and magazines and on cable television and the internet; Knoll would also be required to eliminate its advertising on broadcast television in nearby states that share broadcast signals with Illinois television markets. Application of the advertising ban against Meridia would substantially affect Knoll's commercial advertising on a national and regional basis. In practical effect, the State of Illinois seeks to impose its own policy against advertising prescription drugs classified as controlled substances on other states. This burden on interstate commerce is excessive in relation to the speculative benefits for Illinois citizens.

The Commerce Clause invalidates a state law that in practical effect regulates markets outside the state's borders, even if the extraterritorial reach was unintended by the state legislature. *E.g., Healy v. Beer Institute,* 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (a state liquor price affirmation law that "directly controls commerce occurring wholly outside [state boundaries] exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature"); *Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 581–83, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) (same). The court must evaluate the Illinois advertising ban by considering the practical effect of the law beyond Illinois borders. *Healy,* 491 U.S. at 337, 109 S.Ct. 2491.

The challenged Illinois advertising ban does not facially attempt to control actions outside Illinois. However, overwhelming evidence has been submitted showing that the practical effect of a ban against advertising Meridia in Illinois would: (1) force the removal of advertising in nationally distributed publications and broadcasts; (2) require terminating advertisements in regional publications and broadcasts received in Illinois; and (3) preclude advertising in Illinois publications and broadcasts that are nationally distributed such as *The Chicago Tribune* and WGN–TV. There is no technological or commercially realistic means to black Illinois out of a national advertising market.

Finally, the Illinois advertising ban is inconsistent with the laws of thirty-six other states and the District of Columbia. In accordance with FDA regulations, most states permit advertising controlled substances that are not illegal Schedule I substances.[4] Enforcement of the Illinois

---

4. *See* Ala.Code § 20–2–1 *et seq.* (1998); Alaska Stat. § 11.71 *et seq.* (1998); Ariz.Rev.Stat. Ann. § 36–2501 *et seq.* (1998); Ark.Code Ann. § 5–64–101 *et seq.* (1997); Cal. Health & Saf. Code § 11000 *et seq.* (1999); Colo.Rev.Stat. § 18–18–101 *et seq.* (1997); Conn. Gen.Stat. § 21a–243 (1997); Del.Code tit. 16 § 4701 *et seq.* (1998); D.C.Code Ann. § 33–501 *et seq.* (1998); Fla. Stat. Ann. § 893.01 *et seq.* (1998); Ind.Code § 35–48–1–2 *et seq.* (1998); Iowa Code § 124.101 *et seq.* (1997); Kan. Stat. § 65–4101 *et seq.* (1998); Me.Rev.Stat. tit 22 § 2383–B (1997); Mass. Ann. Laws ch. 94C § 2 (1998); Minn.Stat. § 152.01 *et seq.* (1998); Miss.Code Ann. § 41–28–105 *et seq.* (1998); Mont.Code Ann. § 50–32–103 *et seq.*

(1998); Neb. Rev. Stat § 28–404 *et seq.* (1998); Nev.Rev.Stat. Ann. § 453.011 *et seq.* (1997); N.H.Rev.Stat. Ann. § 318–B:1–a *et seq* (1998); N.M. Stat. Ann. § 30–31–1 *et seq.* (1998); N.Y. Penal Law § 220 *et seq.* (1998); N.C. Gen.Stat. § 90–86 *et seq.* (1997); Ohio Rev.Code Ann. § 3719 *et seq.* (Anderson 1998); Okla. Stat. tit. 63, § 2–101 *et seq.* (1997); Ore. Rev. Stat § 475.005 *et seq.* (1997); Pa. Stat. Ann. tit. 35 § 780–113 (1998); S.C.Code Ann. § 44–53–160 (1998); S.D. Codified Laws § 34–20B–1 *et seq.* (Michie 1998); Tenn.Code Ann. §§ 39–17–401 *et seq.,* 53–11–301 *et seq.* (1998); Tex. Health & Safety Code Ann. § 481.001 *et seq.* (1997);

ban would preclude the general public in most states from receiving accurate, non-misleading information about an FDA-approved prescription drug. Illinois may not impose its policy choices on other states. *BMW v. Gore*, 517 U.S. 559, 571, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *see also American Dairy Queen Corp. v. RTO, Inc.*, 1990 WL 103649, at *1 (N.D.Ill. July 2, 1990) (Illinois may not "impose its notions of good policy upon the other states"). In contrast with this substantial burden on interstate commercial advertising is the fact that the advertising ban has not been shown to be of any value in protecting Illinois citizens from the dangers of drug abuse, illegal drug trafficking, or unethical medical practice. Applying the advertising ban against Meridia is constitutionally impermissible. *Pike v. Bruce Church*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (state law is invalid if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits").

## C. PREEMPTION UNDER THE SUPREMACY CLAUSE

Absent a clear and manifest congressional purpose, a federal statute is not presumed to supercede the states' historic police powers. *Medtronic v. Lohr*, 518 U.S. 470, 486, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). Federal preemption may be based on Congress' express language; preemption may be implied when Congress enacts comprehensive legislation that totally usurps the legislative subject matter; or preemption occurs when a state law conflicts with a federal law or constitutes an obstacle to congressional objectives. *Capital Cities Cable v. Crisp*, 467 U.S. 691, 699, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984).

Knoll first argues that federal law expressly preempts state regulation of cable television, citing the Cable Communications Policy Act, 47 U.S.C. § 521 *et seq.*

The Act states, "any provision of law of any State ... which is inconsistent with this chapter shall be deemed to be preempted and superceded." 47 U.S.C. § 556(c). While the Cable Communications Policy Act explicitly preserves state authority to regulate cable television in matters of public health, safety and welfare, a state's regulatory authority is preserved only if it is consistent with the Act. 47 U.S.C. § 556(a). Knoll cites *Capital Cities Cable*, where the Supreme Court invalidated a state attempt to ban advertisements for alcoholic beverages on cable television. The Court reasoned that the state required " ... cable television operators to delete commercial advertising contained in signals carried pursuant to federal authority, [therefore] the State has clearly exceeded [its] limited jurisdiction and interfered with a regulatory area that ... [has been] ... explicitly preempted." 467 U.S. at 705, 104 S.Ct. 2694. Without explanation or citing authority, the State of Illinois simply responds that the *Capital Cities Cable* decision is obsolete. Nor does the state address the significant fact that the Cable Communications Policy Act expressly forbids state regulation of the content of cable television services. 47 U.S.C. § 544(f). Certainly commercial advertising is a cable television service. The Illinois advertising ban is in direct conflict with the express provisions of the Cable Communications Policy Act. The Illinois Controlled Substances Act as applied to Meridia's cable television advertisements is therefore preempted by federal law.

Knoll's preemption arguments concerning other aspects of its advertising campaign are not so successful. The claim that internet advertising is preempted by federal law is unsupported by any citation of federal law. Knoll merely cites (without explanation) *American Libraries Ass'n v. Pataki*, 969 F.Supp. 160 (S.D.N.Y.1997). *American Libraries* held that a New York

Utah Code Ann. § 58-37-1 *et seq.* (1998); Va.Code Ann. § 54.1-3400 *et seq.* (1998); W. Va.Code § 60A-1-101 *et seq.* (1999); Wis. Stat. § 961.001 *et seq.* (1997); Wyo. Stat. Ann. § 35-7 (1999).

statute prohibiting dissemination of pornographic materials to minors on the internet violated the Commerce Cause. The opinion does not discuss or analyze whether the challenged statute was preempted by any federal law; *American Libraries* has no bearing or precedential value on the preemption issue.

Next, Knoll asserts that Illinois' attempt to regulate the content of broadcast television is preempted by unidentified federal law and cites two cases that have no bearing on congressional intent with respect to the regulatory scheme here. *Allen B. Dumont Labs. v. Carroll,* 184 F.2d 153, 156 (3d Cir.1950), *cert. denied,* 340 U.S. 929, 71 S.Ct. 490, 95 L.Ed. 670 (1951); *Kingsley Int'l Pictures Corp. v. Regents of Univ. of State of New York,* 360 U.S. 684, 699, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959) (Douglas and Black, JJ., concurring). This argument is frivolous. However, in a footnote Knoll concludes that because of the FDA's detailed federal policy and regulations concerning the advertisement of prescription drugs, Illinois' attempt to restrict advertising of prescription drugs has been preempted. Pl. Br. at 15, n. 13. Again, the argument is unsupported with any basis to conclude that Congress intended to generally preempt the regulation of prescription drug advertising.

In its reply, Knoll improperly raises a new argument: compliance with both federal and Illinois advertising requirements is impossible because the Illinois Controlled Substance Act bans advertisements by name, while the FDA requires Knoll to use Meridia's name in its advertisements. To support its new argument, Knoll quotes 21 C.F.R. § 292.1(b)(2): "[t]he established name shall be printed in letters that are at least half as large as the letters comprising the proprietary name or designation* * * *." Pl. Reply at 14. Because this argument was untimely raised and the state has not had an opportunity to respond, the court deems this preemption issue as to broadcast television waived.

## D. INJUNCTIVE RELIEF

In deciding whether to grant injunctive relief, the court has considered the following four factors:

(1) Knoll prevails on the merits of its First Amendment and Commerce Clause claims, and partially prevails on its Supremacy Clause claim;

(2) Knoll will suffer irreparable harm if an injunction is not issued because it must either terminate its advertising campaign or face sanctions by the Illinois Department of Professional Regulation, including loss of its license to distribute pharmaceuticals in Illinois;

(3) the threatened harm to Knoll from enforcement of the Illinois Controlled Substance Act advertising ban against Meridia substantially outweighs speculative harm to the State of Illinois or its citizens if an injunction issues; and

(4) the public interest clearly favors free public access to accurate, non-misleading information about the effectiveness, limitations and risks of using a prescription drug.

Accordingly, Knoll is entitled to a permanent injunction. Fed.R.Civ.P. 65(a)(2); *Old Republic Ins. v. Employers Reinsurance,* 144 F.3d 1077, 1081 (7th Cir.1998); *Plummer v. American Inst. of Cert. Pub. Accountants,* 97 F.3d 220, 229 (7th Cir. 1996).

## CONCLUSION AND ORDER

The material facts are undisputed and Knoll is entitled to judgment as a matter of law. As applied to Meridia, an FDA-approved and nationally advertised prescription drug, the Illinois Controlled Substance Act ban on advertising controlled substances by name violates the First Amendment and the Commerce Clause of the United States Constitution. Insofar as the Illinois Controlled Substance Act proscribes advertising Meridia on cable television, the Illinois law is preempted by the Cable Communications Policy Act. Knoll is

entitled to a permanent injunction prohibiting defendants from enforcing the Illinois Controlled Substance Act against Knoll because of Meridia's advertisements.

**IT IS HEREBY ORDERED** that defendants Len Sherman, in his capacity as Director of the Illinois Department of Professional Regulation, and John Coghlan, in his capacity as Director of Statewide Enforcement of the Illinois Department of Professional Regulation, are permanently enjoined from taking any action under the Illinois Controlled Substance Act against plaintiff Knoll Pharmaceutical Company with respect to advertising its prescription drug Meridia.